**UNITED STATES of America, Appellee,**

v.

**Michael Paul UDOFOT, Appellant.**

**No. 82–2098.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1983.

Decided June 30, 1983.

Rehearing and Rehearing En Banc Denied Aug. 11, 1983.

Certiorari Denied Oct. 11, 1983. See 104 S.Ct. 245.

Joseph T. Walbran, Asst. U.S. Atty., D. Minn., Kristin Siegesmund, Sp. Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Phillip S. Resnick, Robert G. Davis, Minneapolis, Minn., for Michael Paul Udofot.

Before BRIGHT, ARNOLD, and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Michael Paul Udofot was convicted by a jury of one count of knowingly delivering to a common carrier firearms and ammunition for shipment in interstate and foreign commerce without notifying the carrier that firearms and ammunition were being shipped, in violation of 18 U.S.C. §§ 922(e), 924(a) (1976). The principal question before us is whether Udofot was convicted of a crime of specific intent. We hold that 18 U.S.C. § 922(e) is not a crime of specific intent and that the district court[1] did not err in instructing the jury that Udofot need only voluntarily and intentionally deliver a firearm to the carrier for interstate or foreign shipment. Finding no merit to any of appellant's remaining contentions, we affirm the conviction.

Udofot attempted to purchase up to a dozen .32 caliber revolvers from the Minneapolis Outlet so that he could take them to Africa. Dennis Bohnsack, the store manager, did not have that many guns available but told Udofot that more could be ordered. Bohnsack advised Udofot that city forms would have to be filled out and that there was a mandatory waiting period of approximately a week before the guns could be taken. After Udofot left the store, Bohnsack reported the incident to the Bureau of Alcohol, Tobacco and Firearms.

---

1. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota.

A.T.F. Agent Paul Zamzow, posing as a firearms dealer, placed a telephone call to Udofot, who expressed an interest in purchasing some guns. The two later met at the public library in downtown Minneapolis, Zamzow equipped with a recording device. Udofot told Zamzow that he was interested in purchasing ten or twelve handguns now for resale overseas, and that he could anticipate future transactions of possibly twenty at a time. Price, not quality, appeared to be his main concern. Zamzow said that he would try to give him a better price than that offered at the Minneapolis Outlet, but would have to check with his sources and would call him back. Later, Zamzow called Udofot and told him that he could not obtain the desired weapons. Udofot was disappointed because the delay was affecting his travel arrangements, but suggested that Zamzow try to find some other guns and that even "hot ones" would be suitable.

Meanwhile, Customs Agent James Fetsch went to the Minneapolis Outlet to deliver copies of International Traffic and Firearms Regulations dealing with the export of firearms, and instructed Bohnsack to explain the requirements to Udofot. Bohnsack did so when Udofot returned. Nevertheless, as Agent Fetsch later ascertained from the Department of State, Udofot never did apply for, or receive, an export license.

On March 13, 1982, federal agents observed Udofot return to the Minneapolis Outlet to conclude his purchase of firearms. After additional forms were filled out as required by federal law, Udofot purchased ten .32 caliber H & R revolvers and ten boxes of ammunition, and left the store.

The following day Udofot went to the Minneapolis-St. Paul International Airport, intending to take Northwest Airlines Flight 220 to New York, with connecting flights to Nigeria. Udofot went to the ticket counter, presented his tickets, and checked two items of luggage, a burgundy suitcase and a garment bag, through to Calabar, Nigeria. He retained a briefcase and another garment bag as carry-on luggage. Despite a warning sign at the check-in counter that fire-arms in checked luggage must be declared, Udofot did not notify the Northwest ticket agent that he had guns and ammunition in his suitcase. A Northwest supervisor notified federal agents that Udofot had arrived and had checked in luggage, and gave them tag numbers and descriptions. The agents waited in the baggage makeup area where bags are loaded prior to going on the aircraft, and picked up Udofot's checked luggage as it came off the carrousel. Customs Agent Fetsch, accompanied by other federal agents, passed the checked bags through the airport x-ray machine, which showed a distinct outline of handguns in Udofot's suitcase. Udofot was arrested as he entered the jet-way to board his flight.

Subsequently, A.T.F. Agent Robert Williams applied for, and received, a search warrant for Udofot's checked and carry-on baggage. Upon executing the warrant on March 16, 1982, agents seized ten .32 caliber H & R revolvers and ten boxes of ammunition from Udofot's suitcase.

On April 9, 1982, an indictment was returned, charging Udofot, in Count I, of knowingly delivering to a common carrier firearms and ammunition for shipment in interstate and foreign commerce without notifying the carrier that firearms and ammunition were being shipped, in violation of 18 U.S.C. §§ 922(e), 924(a) and, in Count II, of knowingly and willfully exporting and attempting to export firearms and ammunition without first having obtained an export license, in violation of 22 U.S.C. §§ 2778(b)(2), 2778(c) and 22 C.F.R. §§ 123.01, 127.

Udofot moved to suppress the firearms and ammunition seized on the grounds that the affidavit supporting the search warrant did not establish probable cause and that the affidavit contained information obtained as a result of a prior unlawful warrantless search, the x-raying of Udofot's luggage. The district court adopted the magistrate's recommendation that the motion be denied.

In a trial by jury, Udofot was found guilty of Count I and not guilty of Count II. The district court fined Udofot $500 and

sentenced him to eighteen months imprisonment, the execution of which was to be suspended after sixty days on condition of probation for eighteen months.

On appeal Udofot argues that the trial court erred (1) in refusing to give a specific intent instruction on 18 U.S.C. § 922(e); (2) in instructing the jury that notice is required under the "passenger exception" of section 922(e); and (3) in denying his motion to suppress. He further argues that section 922(e) is unconstitutionally vague and violates due process, and that the conduct of government agents was so outrageous as to violate due process.

I.

■ Appellant's chief contention is that the trial court erred in refusing to give a jury instruction on specific intent,[2] which he claims is an essential element of 18 U.S.C. § 922(e).[3] The trial court instead gave the following instruction:

> The mere delivery of a firearm to a common carrier, without giving notice to the carrier, is a violation of the code section that I just read to you regarding Count I. It is not necessary for the government to prove that the defendant knew that notifying the carrier was required. It is sufficient if you find beyond a reasonable doubt that he knowingly delivered a firearm.
>
> We say an act is knowingly done if it is done voluntarily and intentionally and not because of mistake, accident or some other innocent reason.
>
> We add the word "knowingly" to make certain that no one is convicted of a crime, for an act which they do by mistake or accident or for some innocent reason other than knowing about it.

The seminal case on the issue of specific intent in federal firearms laws is *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). In *Freed* the Supreme Court held that there was no requirement of specific intent or knowledge in cases charging the defendant with receiving or possessing a firearm not registered to him under 26 U.S.C. § 5861(d). Relying on *Freed,* courts have repeatedly refused to read a specific intent requirement into other firearms statutes. *See United States v. Turcotte,* 558 F.2d 893, 896 (8th Cir.1977) (per curiam) (18 U.S.C. § 922(h)); *United States v. Powell,* 513 F.2d 1249, 1251 (8th Cir.) (per curiam) (18 U.S.C. §§ 922(a)(1), 1202(a)(1)), *cert. denied,* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77 (1975); *United States v. Ruisi,* 460 F.2d 153, 156–57 (2d Cir.) (18 U.S.C. § 922(a)(1)), *cert. denied,* 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972). The rationale adopted by these cases is that Congress will not be presumed to have required specific intent as an element of the crime where the purpose of the statute is the regulation of dangerous objects such as firearms. *See United States v. Freed,* 401 U.S. at 607–10, 91 S.Ct. at 1117–18.

Appellant attempts to distinguish these cases by arguing that section 922(e) requires that a person "knowingly" deliver a firearm to a carrier for interstate or foreign shipment. The use of the word "knowingly" in section 922(e) does mean that the Government must prove beyond a reasonable doubt that the defendant knew that he was delivering firearms to the carrier. Appellant incorrectly assumes, however, that the word "knowingly" requires that the Government must also prove a specific intent to violate the law. In the absence of

**2.** Specific intent, as defined by the district court, is the knowing failure to do an act which the law requires, purposely intending to violate the law. [R. 456–57.]

**3.** Section 922(e), in part, provides:

It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped; . . . .

18 U.S.C. § 922(e) (1976). The statute also contains a passenger exception, which is treated in Part II of this opinion.

statutory language or legislative history to the contrary, Congress' use of the word "knowingly" in a criminal statute aimed at regulating dangerous objects does not itself abrogate the ancient maxim that ignorance of the law is no excuse. *See United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971); *United States v. Currier,* 621 F.2d 7, 10 (1st Cir.1980). In the statute at issue here, the word "knowingly" modifies the verb "to deliver," which it immediately precedes. There is no reference to "law," "violating the law," or similar language which "knowingly" could be read to modify.[4] Nor is there anything in the legislative history to suggest that Congress intended to impose a specific intent requirement in this particular section of the Gun Control Act. Here, as in other sections of the Act, Congress' main concern was to control the unchecked movement of firearms and ammunition in interstate or foreign commerce which undermines legitimate efforts to impose reasonable restrictions upon their possession and use. *See United States v. Williams,* 485 F.2d 1383, 1385 (4th Cir.1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1947, 40 L.Ed.2d 293 (1974); H.R.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 4410, 4411–15, 4420. Finding no evidence from which to infer a specific intent requirement, we accordingly decline to do so here.

This result is consistent with cases that have interpreted the meaning of the word "knowingly" in other sections of the Gun Control Act. In *Cody v. United States,* 460 F.2d 34, 38 (8th Cir.), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 454, 34 L.Ed.2d 303 (1972); *United States v. Cornett,* 484 F.2d 1365, 1368 (6th Cir.1973), and *United States v. Beebe,* 467 F.2d 222, 226 (10th Cir.1972), *cert. denied,* 416 U.S. 904, 94 S.Ct. 1607, 40 L.Ed.2d 108 (1974), the Eighth, Sixth, and Tenth Circuits respectively held that section

922(a)(6), which prohibits a purchaser from "knowingly" making a false statement of a material fact intended or likely to deceive the dealer, does not require a showing that the defendant "knowingly" violated the law, but simply requires proof that the defendant "knowingly" made a false statement. Similarly, in *United States v. Currier,* 621 F.2d 7, 10 (1st Cir.1980), the First Circuit construed section 922(m), which prohibits a person from "knowingly" failing to maintain a firearms transaction record, as requiring only a showing that the defendant knew that he did not complete the required forms.

*United States v. Behenna,* 552 F.2d 573 (4th Cir.1977), and *United States v. Haddad,* 558 F.2d 968 (9th Cir.1977), which are cited by appellant, do not establish otherwise. In *United States v. Behenna,* involving a conviction for violating section 922(a)(6), the court remanded for retrial because the district court never presented the jury with the ultimate factual issue of whether the defendant knew he was not a resident of South Carolina and therefore knowingly misrepresented his status. The court did not allow the defendant to defend on the ground that he did not know that it was illegal to make false statements. In *United States v. Haddad,* the court merely held that section 922(h)(1), proscribing receipt of a firearm by a convicted felon, was not unconstitutionally vague because the wording of the statute made clear that knowledge was not an element of the crime and that mere receipt was sufficient. Although the court observed that "Congress made knowledge an element of other portions of section 922," the court never suggested that the use of the word "knowingly," by itself, creates a specific intent requirement.

Finally, appellant attempts to analogize this case with *United States v. Marvin,* 687 F.2d 1221 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1768, 76 L.Ed.2d 342

---

4. The language of section 922(e) is in direct contrast to that of section 922(f), which provides: "It shall be unlawful for any common or contract carrier to transport or deliver in interstate or foreign commerce any firearm or ammunition *with knowledge or reasonable cause to believe that the shipment ... would be in violation of the provisions of this chapter."* 18 U.S.C. § 922(f) (1976) (emphasis added).

(1983), which construed the word "knowingly" in 7 U.S.C. § 2024(b). In *Marvin* we held that the trial court should have given a specific intent instruction that the Government had to prove that the defendant knowingly did an act which the law forbids. Nonetheless, we do not find any meaningful analogy between *Marvin* and the case at bar. The statute in *Marvin* was directed at the unlawful use, transfer, acquisition, alteration, or possession of food stamp coupons. It did not, as the statute does here, seek to regulate dangerous or harmful objects, which implicate a different set of considerations. *See generally United States v. International Minerals & Chemical Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 1701, 29 L.Ed.2d 178 (1971). Dissimilarities also exist in the language of the two statutes. In *Marvin* an ambiguity existed because the word "knowingly" could be read to modify the verbs that it immediately preceded, or the entire remainder of the clause in which it appeared.[5] There is no such ambiguity here.

We hold that the Government did not have to prove that appellant "knowingly" violated the law, but only that appellant "knowingly" delivered firearms or ammunition to the carrier. The trial court did not err in refusing to instruct the jury that specific intent is an element of the offense under 18 U.S.C. § 922(e).

## II.

■ Appellant's second point on appeal focuses on the second portion of 18 U.S.C. § 922(e), which provides for a limited passenger exception[6] to the written notice requirement of the first portion of the statute. Appellant argues that the trial court erred in instructing the jury that to qualify for the passenger exception a passenger must provide notice to the carrier that firearms are being delivered into its custody. Appellant essentially argues that relinquishment of control is all that statute requires of a passenger, and in support of this argument he observes the absence of an explicit notice requirement in the wording of the exception.

The district court submitted the following instruction to the jury:

Now I read to you the exception in the statute and also, as I told you, the government must establish that the delivery in this instance did not fall within that exception and this exception relates to the written notice requirement when a passenger owns the firearm being transported and the passenger openly delivers the firearm into the custody of the pilot, notifying him of the firearm.

However, it is the law that delivery of a packaged firearm or one concealed in luggage to an agent of the common carrier without giving oral or written notice does not qualify for this particular exception.

In *United States v. Williams,* 485 F.2d 1383, 1384–85 (4th Cir.1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1947, 40 L.Ed.2d 293 (1974), the Fourth Circuit rejected an argument identical to that urged by appellant, stating:

The language of Section 922(e) is manifestly clear in its requirement that firearms and ammunition be brought to the carrier's attention, either by written notice in the case of a shipper or by a delivery into the carrier's custody of the firearm itself in the case of a passenger. Carrying [appellant's] argument to the

---

**5.** Section 2024(b), in part, provides:

[W]hoever knowingly uses, transfers, acquires, alters, or possesses [food] coupons ... in any manner not authorized by this chapter or the regulations issued pursuant to this chapter shall, if such coupons ... are of a value of $100 or more, be guilty of a felony ....

7 U.S.C.A. § 2024(b) (West Supp.1983).

**6.** The passenger exception provides as follows:

[A]ny passenger who owns or legally possesses a firearm or ammunition being transported aboard any common or contract carrier for movement with the passenger in interstate or foreign commerce may deliver said firearm or ammunition into the custody of the pilot, captain, conductor or operator of such common or contract carrier for the duration of the trip without violating any of the provisions of this chapter.

18 U.S.C. § 922(e) (1976).

absurd extreme, a dealer, barred from shipping a single firearm in interstate commerce aboard a common carrier without giving the carrier written notice, could ship any quantity of firearms and ammunition in sealed containers and evade the requirement of written notice by the simple expedient of flying as a passenger and carrying the containers as luggage. Such surreptitious traffic in firearms and ammunition was the precise menace at which the Gun Control Act of 1968 was directed. . . .

The legislative history accompanying Section 922(e) [reported as 922(d)] reveals that the notice requirements were designed "to make more effective the succeeding subsection [enacted as 922(f); reported as 922(e)] which prohibits a carrier from transporting or delivering a firearm in violation of the chapter." 3 U.S.Code Cong. & Ad.News, p. 4420 (90th Cong., 2d Sess. 1968). Plainly, if a carrier is not put on notice of a firearm's presence it cannot discharge its legal obligation to insure that the transportation is lawful. The absence of an explicit requirement of notice in the passenger exception was obviously predicated on the common sense belief that delivery of firearms and ammunition into a common carrier's custody would be done in a manner which would make the carrier aware of that fact.

See also United States v. One Heckler-Koch Rifle, 629 F.2d 1250, 1254 (7th Cir.1980) (dictum); United States v. Burton, 351 F.Supp. 1372, 1378 (W.D.Mo.1972), aff'd on other grounds, 475 F.2d 469 (8th Cir.), cert. denied, 414 U.S. 835, 94 S.Ct. 178, 38 L.Ed.2d 70 (1973). We agree that to comply with the passenger exception of section

922(e), a passenger must give the carrier at least actual notice that the item to be transported is a firearm or ammunition.[7] Although the district court does not phrase the notice requirement precisely in these terms, we do not find its elaborations of this concept to be in error. In the first paragraph of the instructions quoted above, the district court states that the exception refers to open delivery of the firearm into the custody of the pilot, "notifying him of the firearm." We read the instruction as doing no more than requiring that the pilot be made aware that a firearm is delivered to him. If the firearm is delivered into the custody of the pilot, common sense would indicate that the pilot would identify it as such. The additional phrase makes sure that the pilot is aware that a firearm is delivered to him, and this would be particularly appropriate in situations where the identity of the article might be ambiguous, as in the case of a firearm concealed in some other object or conceivably a firearm delivered in a case or other container. If the firearm by its appearance to the pilot does not make evident that it is a firearm, notice to the pilot that it is a firearm does nothing more than establish the clarity of the delivery of the firearm, as required by the exception.

■ We further believe that the second paragraph of the district court's instructions set forth above is not an improper statement of the law. The district court states that the delivery of a packaged firearm or one concealed in luggage to an agent of the common carrier without giving "oral or written notice" does not qualify for the exception. We believe that the use of the phrase, "oral or written notice," was fully justified because in these circumstanc-

---

**7.** We reject appellant's contention that the *Williams* court's reliance on House Report No. 1577 is flawed. It is true that the passenger exception was not part of the prototype version of the Gun Control Act and was added on the floor of the House of Representatives after the bill had been reported out of committee; the amendment was apparently added in response to concerns that the bill would prevent owners from transporting their firearms in interstate commerce. *See* 114 Cong.Rec. 21,806, 23,088

(1968) (statements of Rep. Pollock). Nothing in the legislative history suggests, however, that the passenger exception was intended to weaken the basic purpose of section 922(e), which is to place carriers on notice so that they can ensure the legality of their shipments. Indeed, the requirement that the firearm itself, and not just the container, be delivered into the carrier's custody, argues forcefully that Congress intended that the carrier would be put on notice.

es the only effective way of providing actual notice of the delivery of a firearm would be by giving oral or written notice. A different situation would be presented if the firearm were handed directly to an agent of the carrier and the identity of the item clearly spoke for itself. In that situation, actual notice might well be achieved by delivery of the item itself.

■ We conclude by observing that an instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926). Although the instructions could have been worded differently, when viewed as a whole, they accurately and adequately define the essential elements of the offense, and the two paragraphs that are the subject of Udofot's complaint do not inject matters that are prejudicial to him. Thus, we find no merit to the charge of error here.[8]

### III.

Appellant also contends that the trial court erred in denying the motion to suppress the physical evidence seized from Udofot's luggage pursuant to a search warrant. The affidavit in support of the search warrant contained details of the investigation, including information pertaining to the custom agent's x-raying of appellant's luggage at the Minneapolis-St. Paul International Airport. Appellant argues that the x-raying was an illegal search that tainted the subsequent search warrant, and cites a number of cases for the proposition that luggage, once seized, requires a warrant to be searched. *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977);

*United States v. Stevie,* 582 F.2d 1175 (8th Cir.1978) (en banc), *cert. denied,* 443 U.S. 911, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979); *United States v. Schleis,* 582 F.2d 1166 (8th Cir.1978) (en banc). This case, however, differs from all those since it falls within the well-recognized "border search exception" to the warrant requirement.

■ Under the border search exception, the Government's sovereign authority to protect itself justifies a warrantless search without probable cause of persons crossing the United States' border and of their personal effects. *See Torres v. Puerto Rico,* 442 U.S. 465, 472–73, 99 S.Ct. 2425, 2430, 61 L.Ed.2d 1 (1979); *United States v. Ramsey,* 431 U.S. 606, 618–19, 97 S.Ct. 1972, 1979–80, 52 L.Ed.2d 617 (1977); *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). Such searches may be conducted at international border checkpoints or their functional equivalents. *See Almeida-Sanchez v. United States,* 413 U.S. at 272–73, 93 S.Ct. at 2539 (search reasonable at international airport because functional equivalent of border); *United States v. Sheikh,* 654 F.2d 1057, 1069–70 (5th Cir.1981) (same), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). Although courts traditionally have employed the border search exception to uphold warrantless searches of persons or objects entering the United States, the rationale behind this exception applies with equal force to persons or objects leaving the country: the Government has an interest in protecting some interest of United States' citizens, the individual is on notice that his privacy may be invaded when he crosses the border, and the individual will be searched only because of his membership in a morally neutral class. *See United States v. Stanley,* 545 F.2d 661, 667 (9th Cir.1976) (Lay, Wright & Kilkenny, JJ.), *cert. denied,* 436 U.S. 917, 98 S.Ct.

---

**8.** We also observe that Udofot's counsel may well have waived any objection to the second paragraph of the explanatory instruction set out above. There was considerable discussion concerning the several instructions, and the court made clear that the inapplicability of the exception was to be part of the Government's

burden of proof. Udofot's counsel stated with respect to this portion of the instruction, when asked if he had objection to this language, "No, so long as 8 [the notice instruction] is going to be given I guess I don't have any quarrel with it." [R. 355.]

2261, 56 L.Ed.2d 757 (1978). In *California Bankers Association v. Shultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974), the Supreme Court noted approvingly in dictum that "those entering and *leaving* the country may be examined as to their belongings and effects, all without violating the Fourth Amendment .... " [Emphasis added.] Subsequently, the Second Circuit has relied on the Supreme Court's statement to hold squarely that the border search exception applies to items leaving as well as entering the country. *United States v. Ajlouny,* 629 F.2d at 830, 834 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *United States v. Swarovski,* 592 F.2d 131, 133 (2d Cir.1979); *accord, United States v. Stanley,* 545 F.2d at 665–67.

In the instant case, the record shows that appellant was leaving from an international airport on an international trip. After arriving at the Minneapolis-St. Paul International Airport, appellant went to the Northwest ticket counter, presented his tickets with Calabar, Nigeria as the ultimate destination, and checked two pieces of luggage, a suitcase and a garment bag, through to Nigeria. Testimony from the Northwest customer service representative reveals that Udofot not only was aware of the routing of his luggage but specifically agreed to it. The claim checks issued by Northwest, as well as Udofot's tickets, show the airport of final destination to be Calabar, Nigeria, and also indicate intermediate transfers at New York, Paris, and Douala. After being checked in with Northwest, the luggage proceeded to the baggage makeup area where bags are loaded prior to flight. After matching the tag numbers and descriptions given by Northwest, Customs Agent Fetsch, accompanied by other federal agents, detained Udofot's checked luggage and passed it through an x-ray machine for inspection.

Under these circumstances, for purposes of the customs search, the Minneapolis-St. Paul International Airport was the functional equivalent of a border. Appellant's checked luggage was to be shipped abroad from that port of embarcation, with Calabar, Nigeria as its final destination, and it was to be at all times in international transit or under a carrier's custody until it arrived. By checking his luggage *through to Calabar, Nigeria,* Udofot made it a virtual certainty that a border crossing would take place and that nothing about the object of the search would change in the course of crossing the border. Moreover, in so checking his luggage at Minneapolis-St. Paul, Udofot experienced no greater inconvenience in having his luggage inspected there than he would have experienced had the luggage been inspected in New York. We hold that the warrantless customs inspection—made at the functional equivalent of an international border—was a valid border search, and that the information derived from that inspection could not have tainted the search warrant. The trial court properly denied defendant's motion to suppress.[9]

### IV.

Appellant also argues that section 922(e) is unconstitutionally vague and that it violates due process because it does not require that the defendant be put on notice of the required behavior. We find both of these arguments to be without merit.[10] The statute is not unconstitutionally vague because, in reading its language, one could reasonably understand that delivery of a concealed firearm into the custody of a common carrier was proscribed. *See United States v. National Dairy Products Corp.,* 372 U.S. 29, 32–33, 83 S.Ct. 594, 597–98, 9 L.Ed.2d 561 (1963). Nor does the statute violate due process as applied to appellant.

**9.** Appellant does not seriously challenge the magistrate's alternative holding that, without regard to the information obtained from the x-raying, the affidavit contains sufficient facts to sustain probable cause. After reviewing this information, we are satisfied that the magistrate's alternative holding is fully justified.

**10.** We also entertain some question as to whether appellant has properly raised these issues below.

Unlike *Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), upon which appellant relies, this case involves active, not passive, conduct—the delivery of firearms and ammunition to a common carrier for interstate and foreign shipment—as well as obvious circumstances suggesting the need for inquiring into the applicable legal restrictions. *See United States v. Keuylian,* 602 F.2d 1033, 1043 (2d Cir.1979). The firearms and ammunition involved in this case posed a potential threat to the lives of passengers, and were no less dangerous than the narcotics involved in *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). Moreover, Udofot had extensive exposure to various regulations pertaining to the transfer and movement of weapons in the United States. Not only had he filled out city forms for the guns he purchased, but also had the mandatory waiting period and the export licensing requirements explained to him. The record also shows that, at the time Udofot checked his luggage in with Northwest, a bulletin was posted at the ticket counter announcing in conspicuous print and bold colors that firearms in checked baggage must be declared and unloaded.[11] Finally, it appears that Udofot was a frequent international traveler and knew that carry-on luggage was screened for firearms. Under these circumstances, the fact that the transportation of dangerous weapons and ammunition on a common carrier is strictly regulated should have come as no surprise to appellant. *See United States v. Freed,* 401 U.S. 601, 609, 91 S.Ct. 1112, 1118, 28 L.Ed.2d 356 (1971); *United States v. Keuylian,* 602 F.2d at 1043.

### V.

■ Finally, appellant argues that the conduct of the government agents was so unconscionable and outrageous as to violate due process. He argues that "[r]ather than trying to prevent the crime, the Government agents remained silent, waiting to arrest and prosecute for a crime unwittingly committed and readily preventable." Although the conduct of law enforcement officials could rise to such a demonstrable level of outrageousness as to bar a conviction, *see Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952) (forced stomach pumping to obtain morphine capsules), the instant case is distinctly not of that kind. The government agents were engaged in ordinary undercover activities and in fact encouraged Udofot to obey the export laws. Their conduct was reasonable and well within the bounds of due process.

. The judgment of the district court is affirmed.

11. The bulletin read as follows:

TRANSPORTATION OF FIREARMS AND INSPECTION OF CHECKED BAGGAGE FAA REGULATIONS REQUIRE THAT: FIREARMS IN CHECKED BAGGAGE MUST BE DECLARED AND UNLOADED.

Passengers failing to declare firearms or transporting loaded firearms are subject to a civil penalty of $1,000.

PASSENGERS WITH CHECKED BAGGAGE MAY BE ASKED TO PRESENT IDENTIFICATION AND/OR TO PERMIT INSPECTION OF THEIR CHECKED BAGGAGE.

Passengers refusing to present identification and/or permit checked baggage inspection may not be transported.

U.S. DEPARTMENT OF TRANSPORTATION Federal Aviation Administration Government Exhibits 25–A, 25–B, 25–C.