UNITED STATES of America,

v.

Joaquin **RESTREPO
NARANJA**, Defendant.

No. 85–857–Cr.

United States District Court,
S.D. Florida.

June 10, 1986.

Robert M. Lipman, Asst. U.S. Atty., for the U.S.

Mario Cano, Coral Gables, Fla., for defendant.

## MEMORANDUM DECISION

NESBITT, District Judge.

THIS CAUSE is before the Court upon the Defendant Joaquin Restrepo Naranja's Motion to Suppress Oral and Physical Evidence. The matter was submitted to the Court upon a Joint Stipulation of Agreed Facts. The Court having reviewed the motion and memoranda of law filed and being otherwise duly advised in the premises, finds as follows:

### FACTS

The Defendant is charged in a two-count indictment with transporting a firearm in interstate or foreign commerce without notifying the air carrier of such firearm in violation of 18 U.S.C. §§ 922(e) and 924(a), and transporting United States currency in excess of $10,000.00 to or from the United States without filing Customs Form 4790 in

violation of 31 U.S.C. §§ 5316(a)(1)(A), 5322(a) and 31 C.F.R. § 103.11 et seq.

By way of factual background, on October 29, 1985, agents of the United States Customs Service and agents of the Bureau of Alcohol, Tobacco and Firearms stationed at Miami International Airport were x-raying checked-in luggage with respect to certain flights destined for certain countries, including Colombia. The purpose of the x-ray procedure was to detect firearms being transported in violation of United States laws which require notification of any such firearm to the air carrier. The x-raying was performed only as to luggage on selected flights to certain countries which, based on information, were believed by the agents to be the destination of firearms being illegally transported.

On this date, the Defendant boarded an Avianca Airlines flight destined for Bogota and Medellin, Colombia. The Defendant acknowledges having checked-in at least one piece of luggage prior to boarding the aircraft. This particular suitcase was x-rayed pursuant to the above-described operation and a firearm was detected concealed in a box of artificial sweetener. Agents then boarded the aircraft and questioned the Defendant as to the ownership of the suitcase. Eventually, the Defendant was read his *Miranda* rights and removed from the aircraft, and thereafter made several admissions.

At some point in between the detection of the firearm and the Defendant's detention, the agents inspected a checked-in duffel bag. Although this bag did not contain a name tag, the agents believed that it belonged to the Defendant based on the following: a ticket agent recalled that the Defendant checked-in two bags; the duffel bag bore a ticket stub numbered consecutively to the luggage containing the firearm, the duffel bag bore brown packing tape appearing identical to that found on the luggage containing the firearm. The inspection of the duffel bag revealed over $100,000.00 in currency and commercial paper located in four small cans.

Having detained the Defendant, three events transpired although the precise sequence is unclear. The agents spoke to employees of the airline and determined that the Defendant had not notified the airline that his luggage contained a firearm. The Defendant was arrested for violating 18 U.S.C. § 922(e). The agents searched the Defendant and his carry-on briefcase, which search revealed $13,000.00 in currency. Also discovered in the briefcase were certain items linking the Defendant to the duffel bag, specifically a passport which matched the name on a check found in the duffel bag as well as "Makita" brand drill parts found in both the briefcase and the duffel bag. The Defendant had failed to fill out the required Customs Form 4790 for any of the currency and commercial paper.

On November 7, 1985 an indictment was returned against the Defendant charging a knowing and willful failure to file the Customs Form in violation of 31 U.S.C. §§ 5316(a)(1)(A), 5322(a) and 31 C.F.R. § 103.11 et seq. A superseding indictment was filed on February 27, 1986 which added a count for violation of the laws concerning the exportation of firearms, 18 U.S.C. §§ 922(e) and 924(a).

## ISSUES

Defendant has moved to suppress the physical evidence and statements. Defendant's position is that Customs and agents of the Bureau of Alcohol, Tobacco & Firearms violated his fourth amendment rights in seizing his luggage and currency and any statements which flowed from the illegal seizure. In particular the Defendant asserts the probable cause and or the warrant requirement applies to searches of persons leaving the country, or so-called outward searches even though the "border exception" would apply to searches of persons' belongings entering the country.

In summary the Defendant's position is:

(1) The Eleventh Circuit has not ruled on whether the border exception should apply to outbound travellers;

(2) Under the facts of this case "under the totality of the circumstances" the border exception should not apply; and

(3) Finally, by "targetting" passengers going to some countries and not others, the conduct of the law enforcement was unreasonable and did not meet constitutional requirements.

The Government responds by urging the motion to suppress should be denied as the initial x-ray search of the Defendant's luggage was proper under the "border search" exception to the fourth amendment. Further the Defendant failed to demonstrate "standing" with respect to a search of other luggage checked on the aircraft and the Defendant's carry-on briefcase. The specific threshold issue is whether the border exception to the fourth amendment is applicable to warrantless export or departure searches.[1]

It is agreed that the Eleventh Circuit Court of Appeals has not specifically ruled on this question. Accordingly, a review of the applicable law is appropriate.

## LEGAL DISCUSSION

It has long been recognized that customs officials have been granted broad authority within the scope of their duties to stop and examine any person, vehicle, or baggage or other objects arriving in the United States.[2] This type of search, the so-called border search, has a long judicial history. For historical reasons border searches are exempted from both the usual fourth amendment warrant and probable cause requirements. As the Supreme Court observed in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration.

Border searches then from before the adoption of the Fourth Amendment have been considered to be "reasonable" by the single fact that a person or item ... has entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our borders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself.

Such searches may be conducted at international border checkpoints or their functional equivalents. Searches have been held reasonable at international airports because they are the functional equivalent of a border. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *United States v. Skipwith*, 482 F.2d 1272 (5th Cir.1973).

---

1. If the search of the Defendant's outward bound luggage was proper, once law enforcement agents determined that the Defendant's baggage contained a firearm, they had probable cause to arrest the Defendant for violating 18 U.S.C. § 922(e). 18 U.S.C. § 922(e) provides *inter alia:*

   (e) It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce ... any firearm or ammunition ...

   Thereafter, the agents could properly search the Defendant's luggage to determine whether there were other violations of 18 U.S.C. § 922(e). Once the luggage on the aircraft believed to belong to the Defendant was searched, and the

over $100,000 in currency found, the search of the Defendant's briefcase was proper under 31 U.S.C. § 5317(b) (which only uses a reasonable cause standard).

2. 19 U.S.C. § 482. Search of vehicles and persons.

   "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, ... any ... person on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law ... and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law...."

Although the courts have traditionally utilized the border search exception to uphold warrantless searches not based on probable cause or any suspicion to persons or objects entering the United States, the trend of the courts who have been presented with the issue is to apply it equally to persons or luggage (or other objects) *leaving the country.*

The Eleventh Circuit recently recognized this trend [3] in *United States v. Chemaly,* 741 F.2d 1346 (11th Cir.1984), but declined [4] to apply it in the facts of that case. *Chemaly* involved the search of outbound luggage under the currency reporting statute then in effect, 31 U.S.C. §§ 1101, 1105, which *required* probable cause and a warrant before searches for violations could occur.

In *Chemaly,* the Government had urged that the "border exception" should apply to relieve the government of the necessity of obtaining a warrant under 31 U.S.C. § 1105. The Court said in *Chemaly* at 741 F.2d 1351:

We recognize that other circuits have applied the universal border exception to the fourth amendment's search warrant requirement applicable to a search of incoming passengers to outgoing passengers as well. *See U.S. v. Udofot,* 711 F.2d 831, 839-40 (8th Cir.), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *U.S. v. Duncan,* 693 F.2d 971, 977 (9th Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2436, 75 [77] L.Ed.2d 1321 (1983); *U.S. v. Swarovski,* 592 F.2d 131, 133 (2d Cir.1979). In *U.S. v. Rojas,* 671 F.2d 159, 164 (5th Cir.1982) (Unit B),

we declined to decide whether fourth amendment protections were relaxed at the border for outgoing as well as incoming passengers.

In extending the border search exception to items leaving as well as entering the country, the circuits which have addressed the issue have generally relied upon the case of *California Bankers Assn. v. Schultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). The *California Bankers* case was not concerned with the issue of the lawfulness of Customs searches, but with the enforceability of the Bank Secrecy Act of 1970.[5] However, the court in dictum noted that "those entering and *leaving* the country may be examined as to their belongings and effects, all without violating the fourth amendment...." (Emphasis added.) *Id.* 416 U.S. at p. 62, 94 S.Ct. at 1517.

Subsequently many circuit courts relied on the Supreme Court's statement to hold definitively that the border search exception applies to items leaving as well as entering the country. *U.S. v. Stanley,* 545 F.2d 661 (9th Cir.1976), *U.S. v. Swarovski,* 592 F.2d 131 (2nd Cir.1979), *U.S. v. Asbury,* 586 F.2d 973 (2nd Cir.1978).

Most of the circuits that addressed the subject of border searches have concluded that such searches of persons should be upheld either for policy reasons—the prevention of airplane hijacking, *U.S. v. Davis,* 482 F.2d 893 (9th Cir.1973); the need to stem the "flow of illegal aliens" into the United States, *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49

---

**3.** The currency reporting statute in effect at the time of *U.S. v. Chemaly,* and a similar case *U.S. v. Arends,* 776 F.2d 262 (11th Cir.1985), former 31 U.S.C. § 1105 (recodified at 31 U.S.C. § 5317 (1983)) has since been amended to relax the warrant requirement. See 31 U.S.C. § 5317(b), as amended Pub.L. 98–473, Title II § 901(d), October 12, 1984, 98 Stat. 2135. Under the new statute government agents must only have a "reasonable cause to believe" the currency laws are being violated to search persons, conveyances or objects.

**4.** With due respect to my colleague Judge Thomas Scott who recently stated in a footnote in *U.S.A. v. Maria Teresa Zapata* and *U.S.A. v.*

*Maria Ofelia Zapata,* 647 F.Supp. 15, "The applicability of border search cases to departing passengers is beyond question," it appears the issue needs to be put to rest in this circuit. The Eleventh Circuit has not ruled on the issue, and at least some legal writers believe the border exception should not apply to export searches. *See* "Beyond the Border of Reasonableness: Exports, Imports and the Border Search Exception," Vol. 11 Hofstra Law Review, 773 and "Border Searches and the Fourth Amendment," 77 Yale Law Journal 1007.

**5.** 12 U.S.C. §§ 1730, 1829b, 1951–1959.

L.Ed.2d 1116 (1976), to prevent importation of contraband or of undeclared merchandise; *U.S. v. Weil,* 432 F.2d 1320 (9th Cir. 1970), or arms and ammunition in violation of licensing and export laws, *U.S. v. Gonzalez-Rodriguez,* 513 F.2d 928 (9th Cir. 1975); and to "search newly arrived vessel[s] to determine whether goods requiring entry are aboard," *United States v. Ingham,* 502 F.2d 1287, 1291. The Circuits that have considered routine warrantless airport screening have upheld such searches on various grounds: under the "stop and frisk" search permitted under the "Terry doctrine," *U.S. v. Epperson,* 454 F.2d 769 (4th Cir.1972); or by analogizing them to border searches, *U.S. v. Skipwith,* 482 F.2d 1272 (5th Cir.1973).

Once it has been determined that the border search exception applies, a routine search is permitted without probable cause or even suspicion. *U.S. v. Stanley,* 545 F.2d 661 (9th Cir.1976), *U.S. v. Ajlouny,* 629 F.2d 830 (2d Cir.1980). The border search therefore complies with the fourth amendment unless it violates the "reasonableness standard." *U.S. v. Ramsey, supra* 97 S.Ct. at p. 1980.

What constitutes reasonableness in the context of a border search depends on the particular facts and circumstances of each case. As was said in *U.S. v. Guadalupe-Garza,* 421 F.2d 876 (9th Cir.1970):

> The constitutional safeguards found in the Fourth Amendment extend to persons crossing our borders as well as to persons crossing our streets. "[T]he Fourth Amendment protects people, not places." (*Terry v. Ohio* (1968) 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889, quoting *Katz v. United States* (1967) 389 U.S. 347, 351, 88 S.Ct. 507 [, 511], 19 L.Ed.2d 576.) In either context, official action must meet the standard of reasonableness. The scope of the particular intrusion, the manner of its conduct, and the justification for initating it must all

be considered. The test of reasonableness is incapable of comprehensive definition or of mechanical application; in each case the need for the particular search is balanced against the invasion that the search entails.... (page 878)

The courts in determining whether the search comports with reasonableness have examined the scope of intrusion, the manner of conducting the search, and the justification for initiating the search. *U.S. v. Guadalupe-Garza; U.S. v. Ramsey.*

The fourth amendment reasonableness standard has been defined more broadly in the context of border searches. A search and seizure at the border by customs officials is reasonable even though if conducted elsewhere by different officials it would be violative of fourth amendment protections. The realization of customs officials' special problems has resulted in courts giving the broadest interpretation consistent with our constitutional constraints in construing the powers of customs officials. *U.S. v. Glaziou,* 402 F.2d 8 (2d Cir.1968).

The first border search statute was enacted in 1789 (Act of July 31, 1789, Chapt. 5, 1 Stat. 29). Since that time customs officials have been authorized to stop and examine persons or baggage arriving in the United States on the suspicion that merchandise is concealed which is subject to duty or which can not be legally imported into the United States.[6] In the past few years, Congress has deemed it in the national interest to enact specific legislation to control and regulate exports of controlled substances,[7] firearms and ammunition,[8] and currency.[9]

As the courts have been presented with the issue, it appears that the same policy considerations which justify the border search or customs search should apply to the export as well as to the import search. In view of the concerns of the present history with air piracy, skyjacking, and the need to restrict illicit international drug

---

6. 19 U.S.C. § 482, 1582).

7. 21 U.S.C. § 953(a).

8. 18 U.S.C. § 922(a) et seq.

9. 31 U.S.C. § 5317(b) (as amended Oct. 12, 1984).

trading, it appears those comparisons are well founded. It has become almost common place, particularly in some of the border areas of our country such as the Southern District of Florida, for criminal enterprises to embrace a network of drug couriers going out of our country with large amounts of controlled substances or unreported currency to exchange as well as purchase drugs, firearms or ammunition. The contraband is then in turn brought into this country illicitly by way of offshore loading on vessels or airplanes or concealed in false compartments on vessels, baggage or other containers to avoid the criminal or revenue reporting laws.

One need go no further than recent history and the current concern with air or ship hijacking resulting in the loss of lives and property of our citizens to realize there are very good and valid reasons why the same "policy considerations" should govern travellers leaving our country as well as those entering it. By way of example, an export just as an import search should be carried out to protect the integrity of the country's borders; to be conducted to ensure contraband is seized before some of our citizenry would be endangered and that any licensing or export laws have been complied with.

An argument could be made that incoming travellers are not unreasonably subject to the imposition of a search because they are on notice that a search will take place, and that departing travellers may not have the same expectation of privacy as travellers coming into the country. However, any differences are minimal and do not rise to a constitutional challenge.

A case with similar facts to the instant case involved an airport x-ray search for firearms of luggage bound for Nigeria, revealing handguns. See, United States v. Udofot, 711 F.2d 831, 839 (8th Cir.1983). In Udofot, the defendant was convicted of shipping firearms and ammunition without notifying the carrier under 18 U.S.C. §§ 922(e), 924(a). In response to the defendant's contention that the x-raying was an illegal search, the court held the search came within the "border exception" to the warrant requirement. The Court went on to state at page 839:

Although courts traditionally have employed the border search exception to uphold warrantless searches of persons or objects entering the United States, the rationale behind this exception applies with equal force to persons or objects leaving the country: the Government has an interest in protecting some interest of United States' citizens, the individual is on notice that his privacy may be invaded when he crosses the border, and the individual will be searched only because of his membership in a morally neutral class. See United States v. Stanley, 545 F.2d 661, 667 (9th Cir.1976)....

In the instant case the Defendant was leaving from Miami International Airport bound for Colombia, South America. Pursuant to a warrantless x-ray search of checked-in luggage being sent out of the country, a firearm concealed in a box of artificial sweetener was found in a suitcase belonging to the Defendant. After detaining the Defendant, law enforcement agents determined that, contrary to 18 U.S.C. § 922(e), the carrier (Avianca Airlines) had not been notified by the passenger that a firearm was being transported. The agents then had probable cause to arrest the defendant.

Under these facts, Miami International Airport was a border or the functional equivalent of a border. The government has an interest in protecting its U.S. citizens travelling abroad on the flight as well as other U.S. air passengers on the flight path of the Avianca airplane bound to Colombia from air-highjacking at gun point, as well as protecting the integrity of United States laws concerning the exporting of firearms and munitions without having complied with applicable reporting and licensing laws. In view of current history and tragic events, there is a high likelihood of smuggling attempts of firearms and explosives which could threaten the lives of passengers at airports such as the Miami International Airport.

The question is one of reasonableness and the degree of intrusion. As was recently said by the Supreme Court in *U.S. v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), ruling that a "canine sniff" of luggage is not a search:

> We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can support a seizure based on less than probable cause.

*Place*, 103 S.Ct. at 2642.

■ In response to the "targetting of certain countries" argument urged by the Defendant, there is no requirement that every passenger's luggage be searched. It is not unreasonable for Customs agents to search only baggage bound for certain countries that have a history or "profile" of violating our firearm laws, particularly when there was no serious invasion of privacy, nor any indication that impermissible conduct by the agents or that the search was a "pretext." As the court said in *U.S. v. Duncan*, 693 F.2d at 978 (9th Cir.1982):

> Finally, we do not find any merit in Duncan's claim that the search is unreasonable because he was the only passenger stopped. As we noted above, customs agents have the power to make searches of exiting persons. However, the existence of this power does not require that it be exercised on all persons leaving the United States. There are many reasons, fiscal, administrative and others, why customs might not search all exiting individuals. Duncan does not argue that he was singled out for impermissible reasons.

■ After due consideration of the facts and circumstances of this case and in light of policy considerations as well as historical reasons underlying the export border search, the warrantless x-ray search of the Defendant's outbound baggage was reasonable and proper pursuant to the "border search exception," and under the decisions of *U.S. v. Udofot*, 711 F.2d 831 (8th Cir. 1983) and *U.S. v. Stanley*, 545 F.2d 661 (9th Cir.1976).

■ Within a short time after detaining the Defendant, law enforcement personnel determined that the Defendant had not notified the carrier that his checked-in baggage contained a firearm in violation of 18 U.S.C. § 922(e). The Defendant told law enforcement personnel that he knew nothing about baggage containing the concealed money, traced to him by a ticket stub consecutively numbered to Defendant's checked-in luggage (which contained the firearm). By denying knowledge, the Defendant does not have the requisite standing to suppress the currency as he abandoned any interest he had. *U.S. v. Sneed*, 732 F.2d 886 (11th Cir.1984). Even if the Defendant did have standing to suppress the search, the law enforcement officers had not only reasonable suspicion but probable cause as well to search the Defendant's other luggage to determine whether other firearms were concealed. Upon discovery of the currency concealed in the baggage traced to the Defendant, the officers had either "reasonable cause" to believe that the currency reporting laws were being violated justifying a search under 31 U.S.C. § 5317(b) or could properly search the Defendant's briefcase under the "border exception." Once probable cause was established upon discovery of the firearm and currency, the Defendant was advised of his *Miranda* rights. The agents acted appropriately since a custodial status had attached. Consequently the statements made after the *Miranda* rights are admissable. *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

In view of the foregoing, it is ORDERED AND ADJUDGED as follows:

(1) Defendant's Motion to Suppress Physical Evidence is DENIED.

(2) Defendant's Motion to Suppress Oral Evidence is DENIED.