UNITED STATES of America, Plaintiff,

v.

Guillermo
BARENO–BURGOS, Defendant.

No. CR 89–806(RR).

United States District Court,
E.D. New York.

June 19, 1990.

**774**

Andrew J. Maloney, U.S. Atty., E.D.N.Y. by Andrew J. Luger, Asst. U.S. Atty., Brooklyn, N.Y., for plaintiff.

Mass & Rudin by Joel B. Rudin, New York City, for defendant.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

Guillermo Bareno–Burgos has been charged in a two-count indictment with violating the currency reporting requirements of 31 U.S.C. § 5316 and with having made a false statement to a U.S. Customs Inspector in violation of 18 U.S.C. § 1001. Defendant moves to dismiss the § 5316 count claiming that he was under no duty to file a currency report at the time of his arrest since he had simply boarded a domestic flight to Miami and had not yet made his connection to the flight that would take him to Colombia. He moves to dismiss the § 1001 count in reliance upon the "exculpatory no" doctrine. Defendant further contends that U.S. Customs was not authorized by the border exception to the fourth

amendment to conduct a warrantless search of his bags in New York, thereby requiring suppression of any monies seized. He also seeks suppression of various statements made in purported violation of his fifth amendment rights. For the reasons stated herein, the court grants the motion to dismiss the § 5316 count. All other defense motions are denied.

### Factual Background

Having conducted an evidentiary hearing at which two employees of the United States Customs Service, Inspector Jerry Cordova and Special Agent John Geoghegan testified, and having reviewed certain stipulations entered into between the parties, the court makes the following findings of fact.

1. *The Search of Defendant's Duffel Bag*

On October 31, 1989, Jerry Cordova, together with other Customs inspectors and various officers of the New York City and Port Authority Police Departments, arrived at LaGuardia Airport to inspect luggage that was checked through for international travel.[1] Cordova was one of a team of six Customs inspectors based at John F. Kennedy International Airport that focuses primarily on searching baggage and individuals leaving the United States.

On the morning of October 31, 1989, this outbound inspection team directed its attention to Eastern Airlines flight 011, scheduled to depart LaGuardia at 8:00 A.M. and to arrive in Miami shortly after 11:00 A.M. Law enforcement authorities had no special information about this flight. Rather, it was one they routinely searched on their visits to LaGuardia because it was popular with passengers wishing to connect in Miami to flights for South America. Eastern would, as a matter of course, segregate the baggage of such connecting passengers, which was already checked through to a foreign destination, from baggage that would be claimed in Miami. It was with this separate container that the outbound

---

1. Police officers work cooperatively with Customs at both major New York airports to learn how outbound bags are profiled and searched and to provide Customs with whatever assistance an investigation might require.

inspection team occupied itself on the morning of October 31st.

At about 7:15 A.M., a Customs inspector found approximately half a million dollars secreted in toys contained in a duffel bag scheduled for loading onto flight 011 and checked through to South America. While that seizure was pursued, Inspector Cordova, at approximately 8:10 A.M., spotted another duffel bag amidst flight 011 luggage checked through to Cali, Colombia. The name "Bareno–Burgos" was written on tape placed on the outside. Cordova, who had frequently discovered currency in duffel bags bound for South America, opened the item and again found U.S. currency secreted in toys. Doing a quick check to satisfy himself that more than $10,000 was in the toys, Cordova proceeded to Eastern security to learn the identity and seat location of the passenger whose bag he had just opened.

### 2. *The Questioning on Board Flight 011*

Accompanied by a plain clothes New York City police officer, Cordova, also dressed informally, boarded flight 011, which was being held for take-off, and proceeded to seat 22A. Speaking Spanish, Cordova identified himself to the defendant, Guillermo Bareno–Burgos, as a United States Customs inspector and displayed his badge. In a normal tone of voice, he told Bareno–Burgos he needed to speak with him and, pointing to a nearby galley, said, "Come with me, please." At the time, Cordova was armed with his service revolver, but the weapon was in his waistband, covered by a pull-over sweater. It is undisputed that the weapon was never displayed and the court credits Cordova's testimony that it was not otherwise visible. Moreover, having observed Inspector Cordova, the court is persuaded that nothing about his demeanor or tone on the day in question was threatening or intimidating.

Bareno–Burgos followed Cordova and the police officer into the galley, whereupon Cordova explained to the defendant the currency reporting requirements of United States law. Specifically, Cordova advised the defendant that it was not illegal to transport more than $10,000 out of the United States, but that if such an amount were being transported, a report would have to be filed with U.S. Customs. Cordova had with him copies of the required reporting form, # 4790. As Cordova spoke with defendant, he also showed him the Spanish language version of another Customs form, # 503, which explained the reporting requirements. This form provides:

> There is no limitation in terms of total amount of monetary instruments which may be brought into or taken out of the United States, nor is it illegal to do so. However, if you transport, attempt to transport, or cause to be transported (including by mail or other means) more than $10,000 in monetary instruments on any occasion into or out of the United States, you must file a report (Customs Form 4790) with Customs.
>
> Monetary instruments include U.S. or foreign coin, currency, travelers checks, money orders, and negotiable instruments or investment securities in bearer form.
>
> Reporting is required under the Currency and Foreign Transactions Reporting Act (Public Law 97–258, 31 U.S.C. § 5311, et seq.) as amended. Failure to comply can result in civil and criminal penalties and may lead to forfeiture of the monetary instruments.
>
> If you have any questions, please contact one of the Customs Offices listed on the reverse side or:
>
> U.S. Customs Service/Washington D.C. 20229/(202) 566–8005

Cordova watched Bareno–Burgos follow along the form as the inspector orally explained the requirements. When Cordova made oral reference to the $10,000 limit, he circled that amount on the form explanation. Cordova then asked defendant if he had currency greater than $10,000. Bareno–Burgos replied that he did not. Cordova asked specifically as to travelers checks and money orders. Defendant's responses were all negative. The inspector inquired if defendant had any money that might have been given to him by anyone else. Bareno–Burgos answered, "No." Cordova

asked if defendant had any money in his checked bags belonging either to himself or someone else. Defendant again replied, "No." Cordova asked defendant how much money he had all together, whether his own or anyone else's. Defendant replied, "$1,700." Finally, Cordova asked defendant to sign his name on the explanatory form he had been reading and to note the amount of money he was carrying. Defendant signed "Guillermo Bareno" and wrote "$1700."

At that point, Cordova told Bareno–Burgos that he would not be making the flight to Miami and escorted defendant off the plane. The entire encounter on board took approximately five minutes.

### 3. The Questioning at Kennedy Airport

Cordova drove defendant back to his team office at Kennedy Airport. There, using a standard card, he advised defendant in Spanish of his rights. The court finds that defendant was properly advised of his rights, that he understood them, and that he voluntarily agreed to speak with the Customs officials. With Inspector Cordova serving as an interpreter, Bareno–Burgos told Agent Geoghegan that he had gotten the duffel bag with the money the previous day from a woman whose name he did not know but whom he had met at a bar. She asked him to carry it to Colombia where he would be met by someone. In exchange for his services, he received his airline ticket. Further inquiries prompted defendant to ask for a lawyer, whereupon all questioning ceased.

Customs agents did confirm that Bareno–Burgos had in his possession an Eastern Airlines ticket providing for round-trip travel between New York and Cali, Colombia.[2] Although the return was left open, defendant was booked for travel on October 31, 1989 on board both Eastern flight 011 from New York to Miami and Eastern flight 901 from Miami to Cali, the latter scheduled to leave Miami at 1:20 P.M. Indeed, defendant already had his boarding pass for the 901 flight. An Eastern representative advises that, for such an itinerary, airlines consider New York the passenger's "point of origin" and Miami his "port of departure." Agents also found in defendant's possession claim check 37–62–47, which matched the Cali, Colombia check on the duffel bag searched by Inspector Cordova. Agents discovered that the total amount of currency in defendant's possession on October 31, 1989, whether in baggage or on his person, totalled $501,818. Trained Customs dogs reacted positively for the presence of cocaine upon sniffing the seized currency.

### 4. Airport Procedure

Of some significance to the pending motions are the procedures employed at the various airports at issue in this case. Although two Customs inspectors are assigned on a permanent basis to LaGuardia Airport, no Customs inspections, either inbound or outbound, are performed at that airport on a daily basis. Passengers and luggage entering the United States at LaGuardia from such places as Canada and Bermuda are precleared by U.S. Customs in the foreign country. See generally United States v. Hernandez, 639 F.Supp. 629 (E.D.N.Y.1986) (describing preclearing procedures in Canada). By contrast, at John F. Kennedy International Airport, thousands of persons daily entering the United States from abroad are cleared by Customs at that location.

Even at Kennedy, Customs is not able to check each passenger or piece of luggage leaving the United States. The outbound inspection team checks approximately 150 departing international flights per month at Kennedy. Two to three times per month, the team travels to LaGuardia, where it checks approximately seven flights per day.

At Kennedy, signs are posted and oral announcements made advising outbound passengers of their reporting requirements under United States law. No such signs

---

**2.** Interestingly, this ticket, bearing the defendant's name, was purchased on October 5, 1989, well in advance of the day Bareno–Burgos claimed the mysterious woman approached him about carrying the duffel bag.

are posted or announcements made at La-Guardia. Although the agents at LaGuardia will accept reporting forms there if a passenger wishes to make a declaration, in such circumstances an airline agent must call a Customs inspector to bring a form 4079 to the gate. They are otherwise not generally available.

At Miami International Airport, signs are posted and announcements made advising outbound passengers of their reporting requirements under United States law. Every bag placed on an international flight at Miami is x-rayed, including those bags that have arrived on connecting flights. At the discretion of Miami Customs inspectors, some of these bags may be searched. Similarly, at the discretion of Customs inspectors, passengers leaving Miami for a foreign destination, including passengers who have made connections in Miami from other flights, may be stopped and questioned at the jetway before boarding their international flight.

Bags that were placed on board Eastern flight 901 on October 31, 1989 were x-rayed in Miami, but no searches conducted. Customs inspectors did, however, question a discrete number of passengers about their compliance with United States reporting requirements.

It is undisputed that defendant could properly have filed a currency report in Miami before leaving the United States for Colombia.

## Discussion

### I. Border Search Exception

At issue in this case is whether a Customs search of baggage checked through to a foreign destination, but loaded on a domestic flight from which a foreign connection will be made, comes within the border exception to the fourth amendment warrant requirement. For the reasons stated, this court finds that such baggage is at the functional equivalent of the border and may be searched without a warrant.

The right of a sovereign nation to protect itself by searching persons and cargo crossing its borders has long been recognized. *See, e.g., United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977) (discussion of history of border search exception). Moreover, the most recent amendment to 31 U.S.C. § 5317 provides that:

> For purposes of ensuring compliance with the requirements of section 5316, a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering or departing the United States.[3]

 Defendant urges this court to limit the applicability of the border exception to entries into the United States and, thus, to declare any broader authority in § 5317 unconstitutional. That, however, is clearly not the law in the Second Circuit, which has squarely held that "the border search exception applies to items leaving as well as entering the country." *United States v. Ajlouny,* 629 F.2d 830, 834 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981); *accord United States v. Benevento,* 836 F.2d 60, 67 (2d Cir.1987) (search of bags leaving United States upheld within "border search" exception), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988). Defendant criticizes *Ajlouny* for relying on dicta in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), that "those entering and *leaving* the country may be examined as to their belongings and effects, all without violating the Fourth Amendment....," *Id.* at 63, 94 S.Ct. at 518 (emphasis added). Nevertheless, "[e]very circuit that has considered the question has ruled that the rationales for the 'border exception' apply to both incoming and outgoing persons and instrumentalities." *United States v. Hernandez–Salazar,* 813 F.2d 1126, 1137 (11th Cir.

---

**3.** Prior to its amendment in 1986, § 5317 authorized the Secretary of the Treasury to apply for a search warrant when he had reasonable suspicion to believe § 5316 was not being complied

with. The amended statute plainly expands the authority of Customs to conduct searches to the full extent of the border exception.

1987) (and cases cited therein). Even the Ninth Circuit, some of whose members have expressed reservations about the border search exception when applied to departing passengers, continues to hold "that a suspicionless exit border search is constitutional." *United States v. Nates*, 831 F.2d 860, 862 (9th Cir.1987) (and cases cited therein), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2845, 101 L.Ed.2d 883 (1988). Accordingly, this court will not declare § 5317 unconstitutional or suppress the monies seized from Bareno–Burgos' duffel bag simply because the Customs search at issue was of outgoing rather than incoming baggage.

■ The court turns then to the question of whether the search of Bareno–Burgos' bags at LaGuardia Airport can properly be considered an outgoing border search. "What is the border, for purposes of a Customs search, is not always a simple question" to answer. *See United States v. Gaviria*, 805 F.2d 1108, 1112 (2d Cir.1986), *cert. denied*, 481 U.S. 1031, 107 S.Ct. 1960, 95 L.Ed.2d 531 (1987). This is because common sense and the realities of international travel and transportation have long since prompted judicial recognition of the fact that "border" searches can occur at places other than where shore meets sea. This has given rise to two different concepts: the "functional equivalent" of the border, where searches can take place without any grounds for suspicion; and the "extended" border, where searches can take place on reasonable suspicion. *Id.* Defendant argues that, if this court must find the search of his duffel bag a border search, it should do so under the concept of an extended border, not the functional equivalent. The court disagrees. Where, as in this case, a bag has been consigned to a carrier for delivery to a foreign destination, a border crossing is virtually certain even if intermediate stops in this country will be made first. Thus, the bag is properly considered to be at the functional equivalent of the border from the moment of consignment.

Case law reflects that the functional equivalent of the border need bear no particular time or space relationship to the actual border. Indeed, in first articulating the concept, the Supreme Court recognized that even St. Louis, Missouri could constitute the functional equivalent of the country's border if its airport was the arrival point for a nonstop flight from Mexico City. *See Almeida–Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). In *United States v. Gaviria, supra,* the Second Circuit went even further, holding that the functional equivalent of the border was not dependent upon the United States arrival being non-stop. In that case, a shipment of canned fruit arrived at Miami International Airport from Medellin, Colombia on May 8, 1985. A preliminary Customs check in Miami revealed no contraband. The cargo was transported from Miami to New York, its ultimate destination, by a bonded truck carrier, arriving on May 13, 1985 at the Customs facility at Kennedy Airport. On May 16, 1985, New York Customs inspectors discovered cocaine concealed in certain of the cans of fruit. The Court of Appeals found the New York inspection to be the functional equivalent of a border search even though eight days had passed between the cargo entering the country and the New York search; even though Miami and not New York was the original arrival point in the country; and even though a preliminary search had been conducted in Miami. In the court's view, New York was the functional equivalent of the country's border because: (1) it was the intended final destination of the goods; (2) the goods had travelled in the United States under Customs bond; and (3) there was no evidence that any tampering had occurred in transit. *Accord United States v. Caminos*, 770 F.2d 361, 365 (3d Cir.1985) (Pittsburgh was the functional equivalent of the border for package sent there after domestic stops in New York and Chicago); *United States v. Sheikh*, 654 F.2d 1057 (5th Cir.1981), (Dallas the functional equivalent of the border for package sent from Iran with preliminary stop in Houston), *cert. denied*, 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982); *United States v. Gallagher*, 557 F.2d 1041 (4th Cir.), (Nor-

folk was functional equivalent of the border for a camper sent there from Portugal with initial arrival at port of Baltimore), *cert. denied*, 434 U.S. 870, 98 S.Ct. 213, 54 L.Ed.2d 148 (1977).

In *United States v. Udofot*, 711 F.2d 831 (8th Cir.1983), *cert. denied*, 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983), the Eighth Circuit applied the same logic to the case of an exit search similar to that at issue here. Defendant Udofot checked luggage through to Nigeria when he boarded a flight from Minneapolis to New York, with connecting tickets to Paris and Nigeria. The court upheld a Customs x-ray of the luggage—which revealed undeclared handguns—finding Minneapolis–St. Paul International Airport to be the functional equivalent of the border. Defendant had, after all, designated Nigeria as the final destination of his luggage and his bags would be at all times in international transit or under a carrier's custody. 711 F.2d at 840. As the court explained further:

> By checking his luggage *through to Calabar, Nigeria*, Udofot made it a virtual certainty that a border crossing would take place and that nothing about the object of the search would change in the course of crossing the border. Moreover, in so checking his luggage at Minneapolis–St. Paul, Udofot experienced no greater inconvenience in having his luggage inspected than he would have experienced had the luggage been inspected in New York.

*Id.* (emphasis in original).

This court finds the logic of *Udofot* consistent with *Gaviria* and completely persuasive. Bareno–Burgos, when he arrived at LaGuardia for the first leg of his flight to Colombia, did not simply check his bags through to Miami. He expressly designated Cali, Colombia as their final destination point. Although there is no precise analogy to a Customs bond for outgoing passenger luggage, once Bareno–Burgos surrendered his bags to airline officials, it was virtually certain, as the *Udofot* court noted, that they would thereafter be under the carrier's custody on their way to an inevitable border crossing. Moreover, any concern for tampering on an outgoing flight is better dealt with by having the examination conducted sooner to the time the passenger surrenders his bags rather than later.

The Ninth Circuit, in *United States v. Cardona*, 769 F.2d 625 (9th Cir.1985), reached a somewhat different result in a case involving the shipment of a package. Without citing or distinguishing *Udofot*, that court held that the search of a package consigned in California for delivery to Miami via Federal Express and then to Colombia via Tampa Express should be analyzed as an extended border search rather than one at the functional equivalent of the border. Critical to the court's decision was the "distance and time factors of the present case." *United States v. Cardona*, 769 F.2d at 625.

As already noted, however, neither the Supreme Court nor the Second Circuit has focused on time and space in determining whether a search was conducted at the functional equivalent of the border or at an extension thereof. Indeed, the court in *Gaviria* suggested that what was more relevant to an extended border search than time and space was the fact that a person or some property has initially cleared Customs and entered the United States. *United States v. Gaviria*, 805 F.2d at 1112. Once this has occurred, any subsequent search involves greater intrusion on legitimate expectations of privacy than would occur at the border or its functional equivalent. Thus arises the need for reasonable suspicion to support the intrusion. *Id.* But as the court in *Udofot* aptly noted, once a departing passenger has checked baggage through to a foreign destination, providing for its exclusive transport by common carrier with no further personal involvement in its movements, there is no greater intrusion on privacy or inconvenience caused by having the Customs inspection occur at the point where the bags are first surrendered than at the point where they will ultimately leave the United States. *United States v. Udofot*, 711 F.2d at 840.

Accordingly, this court finds that the La-Guardia Airport search of the duffel bag that Bareno–Burgos had checked through to Colombia took place at the functional equivalent of the United States border and that the motion to suppress monies found therein must be denied.

## II. 31 U.S.C. § 5316

■ This court's holding that the La-Guardia search of Bareno–Burgos' bags took place at the functional equivalent of the border does not resolve the question of whether he can be prosecuted under 31 U.S.C. § 5316 for failing to file a currency report at that location. This court concludes that defendant was not yet sufficiently close to his point or time of departure from this country to come within the statutory duty to file a currency report.

The duty to file currency reports when involved in the international transportation of monetary instruments is defined by both statute and regulation. 31 U.S.C. § 5316(a) provides for the filing of a currency report when one knowingly "transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time" from a place in the United States to a place outside thereof. ' In § 5316(b), however, the statute gives to the Secretary of the Treasury the right to prescribe "the time and place" when reports shall be filed.

The present formulation of § 5316(a) is, in fact, the third version of the statute. Originally, it provided for reporting only when one "transports or has transported" monetary instruments. In 1984, the phrase "attempts to transport" was added to assuage the concern expressed by some courts that the law was not violated until a person was on the verge of boarding the plane or other mode of transportation at the final call for departure. *See* S.Rep. No. 98–225, 98th Cong., 2d Sess. 301, 302, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3481, *quoted in United States v. Jenkins*, 689 F.Supp. 342, 343 (S.D.N.Y. 1988), *rev'd in part, on other grounds*, 876 F.2d 1085 (2d Cir.1989). More recently, in 1986, Congress substituted the words "is about to transport" for "attempts to trans-

port." The House Report explained that this amendment

... clarifies the authority of the Secretary [of the Treasury] ... to require the filing of Reports ... in advance of the actual departure of a person from the United States. The offense of transporting currency or monetary instruments without filing the necessary reports is only triggered once the duty to file the report has been created. This amendment would permit the Secretary to specify events in advance of departure which would trigger the duty to file the report. This would aid in the investigation and prosecution of violations of this section.

H.R.Rep. No. 99–855, 99th Cong., 2d Sess., pt. 1, at 19 (1986), *quoted in United States v. Jenkins*, 689 F.Supp. at 343–44.

Plainly, Congress' intent over the last decade has been to maximize the authority of the Secretary of the Treasury to require the filing of currency reports well in advance of a person's actual departure from the United States. The Secretary, however, has not availed himself of this authority, an omission particularly significant to this case because "civil and criminal penalties attach [under § 5316] only upon violation of regulations promulgated by the Secretary." *California Bankers Ass'n v. Shultz*, 416 U.S. at 26, 94 S.Ct. at 1500.

The regulatory filing requirements are virtually no different today from what they were in 1977 when the Second Circuit "charitably" labelled them "ambiguous." *See United States v. Gomez Londono*, 553 F.2d 805, 811 (2d Cir.1977). At that time, 31 CFR § 103.25 provided:

Reports required to be filed by § 103.23(a) shall be filed *at the time of ... departure* mailing or shipping from the United States....

They shall be filed with the Customs Officer in charge *at any Customs port of entry or departure....* If the currency or other monetary instruments with respect to which a report is required do not accompany a person ... departing from the United States, such reports may be filed by mail on or before the date of

... departure, mailing or shipping, with the Commissioner of Customs.

(Emphasis added). Its present counterpart, 31 CFR § 103.26(b) provides:

> A report required by § 103.23(a) shall be filed *at the time of ... departure,* mailing or shipping from the United States.... All reports required by § 103.23 shall be filed with the Customs officer in charge *at any port of entry or departure....* Reports required by § 103.23(a) for currency or other monetary instruments not physically accompanying a person entering or departing from the United States, may be filed by mail on or before the date of ... departure, mailing or shipping.

(Emphasis added).[4]

Numerous courts have wrestled with the concept of "departure" referred to in the regulations. No court has limited the time of departure to "the moment when the aircraft leaves the landing field," lest Customs officials be left with "no effective means of enforcing the statute." *See United States v. Cutaia,* 511 F.Supp. 619, 624–25 (E.D.N.Y.1981). Instead, the time of departure has been construed to mean "that time reasonably close to the moment of the carrier's actual departure when the passenger has manifested a definite commitment to leave the country with knowledge of the filing requirement and an intention not to file." *Id.* Thus, where a passenger has checked his bags on board an international flight, obtained boarding passes for that flight, and entered the flight departure area, such that "nothing remained ... except [to] walk through the departure gate and present ... tickets and boarding passes," the time of departure at the port of departure has been reached. *Id. Accord Mercado v. U.S. Customs Service,* 873 F.2d 641, 646 (2d Cir.1989) (passenger going through x-ray screening device at entrance of boarding area for flight to Greece found to be at time and port of departure for purposes of § 5316 reporting requirement); *United States v. $122,043.00 in U.S. Currency,* 792 F.2d 1470, 1477 (9th Cir.1986) (passenger on jetway to board flight to Peru was at time and port of departure); *United States v. Ozim,* 779 F.2d 1017, 1018 (4th Cir.1985) (passenger with ticket, boarding pass and seat assignment who attempts to carry currency into secured departure area to await flight to London was reasonably close to time and port of departure); *United States v. $831,-160.45 United States Currency,* 607 F.Supp. 1407 (N.D.Cal.1985) (passenger who has checked bags and received boarding pass for flight to Hong Kong has reached time and port of departure when he arrives at last security checkpoint for international travelers), *aff'd without op.,* 785 F.2d 317 (9th Cir.1986).

The government relies on this line of cases, arguing that Bareno–Burgos had not only secured his ticket and boarding pass for his flight to Colombia and checked his bags through to that location, he had even boarded an aircraft. The flaw in the analogy, of course, is that the aircraft defendant had boarded was about to travel domestically to Miami, not internationally to Colombia. That boarding was still over five hours and several thousand miles away. Although, as noted in the previous point, the functional equivalent of the border may not be tied to concepts of time and space, virtually all of the above-cited cases make

---

4. The parties have spent much time arguing as to the applicability of the "date of ... departure, mailing or shipping" clause of the regulation, in the event Bareno–Burgos had not made his connection in Miami, but had his baggage travel on to Colombia. The defense, for example, argues that in that event it would be ludicrous to call New York the defendant's port of departure from the United States since he himself would never have left the country. The government, on the other hand, argues that if defendant did not accompany the money to Colombia, he is more properly viewed as a shipper whose duty to file exists any time the day of the shipping.

The court declines to join the parties in this exercise. While the government's argument has some appeal, it is based on simple speculation as to what might have occurred in Miami had defendant proceeded there. The fact is that, at the time of his arrest in New York, Bareno–Burgos was physically accompanying his money-laden duffel bag, and not simply shipping or mailing it. Accordingly, the proper inquiry is whether when he boarded Eastern flight 011 at LaGuardia he had reached the time of his departure from the United States at his port of departure.

reference to a person's temporal and spatial proximity to his actual point of departure from this country in deciding whether the duty set forth in 31 CFR § 103.26(b) has arisen. *Mercado v. U.S. Customs Service,* 873 F.2d at 646 (passenger sufficiently close, "both temporally and spatially, to actual boarding" of flight for Greece); *United States v. $122,043.00 in U.S. Currency,* 792 F.2d at 1477 (jetway "extremely close both spatially and temporally to the physical point of departure" for Peru); *United States v. Ozim,* 779 F.2d at 1018 (secured area reasonably close, "spatially and temporally to the physical point of departure" for London); *United States v. $831,160.45 United States Currency,* 607 F.Supp. at 1414 (passenger who arrives at last security checkpoint for Hong Kong flight "satisfied the requirements of proximity in space and time").[5]

Moreover, while it may have been virtually certain that Bareno–Burgos' bags would travel to Colombia without further effort on his part, *see United States v. Udofot,* 711 F.2d at 840 (checking bags through to foreign destination makes crossing of border a virtual certainty), defendant's own international departure still required considerable affirmative action on his part. He would have to deplane in Miami, have his carry-on bags x-rayed again, go through an international security check and then proceed to yet another departure gate to await his Colombia flight. While it was highly likely that he would carry through with these plans, since most persons who pay for international airline tickets do use them, that is not enough to make LaGuardia the time and port of his

international departure. *See United States v. Jenkins,* 689 F.Supp. at 343 (passenger ticketed to depart New York that day for Zaire had not reached time and port of departure when arrested ten hours before flight time in Manhattan hotel).[6] What is required is conduct manifesting "a definite commitment to leave the country," *United States v. Cutaia,* 511 F.Supp. at 625, and no court appears to have found such a commitment made until a passenger accompanying currency or monetary instruments himself clears the security checkpoint for his *international* flight.

*United States v. Donohue,* 885 F.2d 45 (3d Cir.1989), relied on by the government, is not to the contrary. In that case, the court found it irrelevant to the question of venue for a § 5316 offense whether a defendant transporting money from Pennsylvania to Grand Cayman Island via Miami was under any duty to file a currency report other than at Miami. "[E]ven assuming that the report required by section 5316 could only have been filed in Miami," the court found the money transport to have begun in Pennsylvania, and therefore venue to lie there pursuant to 18 U.S.C. § 3237(a). *Id.* at 52. In this case, the issue is not with whether venue would lie in this district had Bareno–Burgos failed to file a report before leaving Miami on October 31, 1989. It is with whether he can be prosecuted for failing to file a report in this district before he ever reached Miami.

 As a general rule, courts do defer to an agency's interpretation of its own regulations. *See, e.g., Ford Motor Credit Co.*

---

**5.** It is precisely because the Second Circuit treats space and time as factors relevant to determining the time and port of departure for purposes of 31 CFR § 103.26(b), *Mercado v. U.S. Customs Service, supra,* but not as factors relevant to determining the functional equivalent of the border, *United States v. Gaviria, supra,* that this court declines the defendant's invitation to treat the terms synonymously—and narrowly—in resolving his various motions. Indeed, a distinction makes sense when one recalls that 31 U.S.C. § 5317 was amended in 1986, the same year as § 5316(a), in order to maximize Customs' investigative authority in currency cases. 31 CFR § 103.26(b), in defining the time and place for filing currency reports, has simply

not kept pace with the broad grant of authority given by Congress. *United States v. Jenkins,* 689 F.Supp. at 343–44.

**6.** While the facts in *Jenkins* are distinguishable—since defendant in that case was at no airport at the time of his arrest—this court shares Judge Cedarbaum's concern that conduct that may very well come within the statutes' broad "about to transport" language can, nevertheless, not be prosecuted criminally unless the Secretary of the Treasury makes clear in the regulations that filings at times and places preceding the actual point of departure are required. *Id.* at 344.

*v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Regional Scaffolding and Hoisting Co., Inc. v. OSHRC*, 865 F.2d 16, 17 (2d Cir.1988). In this case, however, it is not clear that even the Treasury Department, or its subsidiary branch, the United States Customs Service, interprets the time or port of departure to be that at which a passenger boards a domestic flight for a subsequent international connection. Certainly nothing was done by Customs at LaGuardia Airport, by way of notices or announcements, to advise passengers connecting to international flights at other cities that they had reached the time and place for filing currency reports, and yet this is standard procedure at airports such as Kennedy and Miami International. Moreover, stipulations between the parties indicate that Miami Customs inspectors treated passengers connecting there for a flight to Colombia no differently from passengers beginning their travel at that location for purposes of advising about and checking on currency reports. The court further notes that, quite apart from its use in the regulation, the phrase "port of departure" is apparently a term of art in the airline industry. For travel such as occurred in this case, Eastern Airlines labelled LaGuardia the passenger's "point of origin;" Miami as his "port of departure."

In interpreting the scope of the requirements imposed by 31 CFR § 103.26(b), the court is mindful that the regulation has criminal consequences. Thus, due process precludes its application without prior "fair warning" to the public of the conduct prohibited or required. *See, e.g., Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C.Cir. 1986) (Scalia, J.). This court cannot say on the record developed before it that the terms "time of departure" and "port of departure" give the travelling public fair warning that currency reports are required to be filed even before boarding domestic flights if a passenger thereafter intends to connect to an international flight. The Secretary may very well be empowered by the broad language of § 5316(a) to impose such a requirement. But this court cannot guess at what the Secretary intends but has not adequately expressed. "[T]he Secretary as enforcer of the Act has the responsibility to state with ascertainable certainty what is meant by the standards he has promulgated." *See Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976); *accord General Electric Co. v. OSHRC*, 583 F.2d 61, 67 (2d Cir.1978).

For the present, however disturbing Bareno–Burgos' intended transportation of over $500,000 to Colombia may be, the court finds that at the time he boarded Eastern Airlines flight 011 for Miami he was not sufficiently close, temporally or spatially, to his actual departure from this country to be under a duty to file a currency report at LaGuardia Airport. Count I of the indictment, charging a failure to file in violation of 31 U.S.C. § 5316 is, therefore, dismissed.

### III. Defendant's Statements to Customs Officials

Defendant moves to suppress all statements made by him to law enforcement authorities on October 31, 1989. He claims that those made on board flight 011 were obtained without advice of rights as required by *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). As to those made thereafter, he claims that he did not understand the advice of rights given to him at Customs' Kennedy Airport office, thereby precluding a knowing and voluntary waiver.

The court finds that the questioning on board flight 011 was a permissible investigatory stop not requiring *Miranda* warnings. Moreover, from the facts adduced at the hearing, the court finds that Bareno–Burgos was properly advised of his rights at Kennedy Airport and voluntarily agreed to speak to the agents.

### A. The Statements on Board Flight 011

The government acknowledges that defendant was not advised of his rights prior to speaking with Inspector Cordova on board flight 011. It argues that no advice of rights was required, however, because

the encounter constituted routine border questioning. *See United States v. Silva,* 715 F.2d 43, 46–48 (2d Cir.1983) (*Miranda* warnings need not be given in advance of routine border questioning). Quite apart from the fact that no "routine" border questioning appears to be conducted by Customs at LaGuardia Airport, this court must disagree with the government's analysis.

■ Although this court has held that the LaGuardia Customs' search of defendant's checked baggage took place at the functional equivalent of the border, it cannot agree that defendant himself was at the border when he was questioned in New York. While the baggage, once checked through to Colombia and surrendered to Eastern Airlines, was inevitably bound for South America without any further action by defendant, for Bareno–Burgos himself to leave the United States, a number of affirmative steps were still required after he left New York. Most obviously, sometime between 11:00 A.M., when his New York flight would arrive in Miami, and 1:20 P.M., when flight 901 for Colombia was scheduled to depart, Bareno–Burgos would have to find his way to the international departure section of the Miami Airport; he would have to go through the security check at that airport; and he would have to present himself for boarding on flight 901. However likely it is that he would have done these things given his possession of a boarding pass for flight 901, this court still cannot say that a border crossing on his part was a "virtual certainty." *See United States v. Udofot,* 711 F.2d at 840. Accordingly, his interview with Inspector Cordova cannot be analyzed as routine border questioning.

There remain three other possible characterizations for the encounter. The first would be a voluntary interview, the second an investigatory stop, and the third an arrest. Only the last requires advice of rights. *See United States v. Galindo–*

*Hernandez,* 674 F.Supp. 979, 982 (E.D.N.Y. 1987) (and cases cited therein).

■ Certainly, when law enforcement officers do nothing more than approach an individual in a public place and ask if he is willing to answer some questions, there is no reason to suppress his voluntary answers, even if they were given without advice of rights. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). Nevertheless, an interview cannot be considered voluntary if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). Indeed, even a "momentary" detention precludes an interview from being voluntary. *See Florida v. Royer,* 460 U.S. at 498, 103 S.Ct. at 1321.

■ In this case, Customs officials detained Eastern flight 011 at the gate at LaGuardia in order to board the airplane and question Bareno–Burgos. The Supreme Court has long acknowledged that stopping a private vehicle from proceeding on its way while occupants are questioned constitutes a seizure. *See, e.g., Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984). Several courts have expressed similar concern when authorities stop and board public transportation, questioning passengers as to their identities and travel plans. *See United States v. Lewis,* 728 F.Supp. 784, 787 (D.D.C.1990) (random questioning of passengers aboard bus to check for narcotics held to be a seizure); *Bostick v. Florida,* 554 So.2d 1153 (1989) (random questioning of bus passengers held to be a seizure).[7] Certainly, whether one is in a private or public vehicle, once movement of that vehicle has been halted by the authorities, passengers are not free to "decline to listen to the questions" posed and to "go on [their] way." *Florida v. Royer,* 460 U.S. at 498, 103 S.Ct. at 1324. Indeed, if the authorities' retention of a suspect's air-

---

7. The facts in *Bostick* are quite different from those present in this case. The sheriff's officers who boarded the bus wore raid jackets; some

blocked the aisle leading to the only exit; one appeared to be carrying a gun.

line ticket during questioning sufficiently prevents him from going "on his way" and thereby requires a finding of detention, *see Florida v. Royer*, 460 U.S. at 501, 103 S.Ct. at 1326, then a hold placed on the very plane for which a suspect has a ticket and on which he is then seated must similarly qualify as a detention. Plainly, neither Bareno–Burgos, nor anyone else on board flight 011, was going on his or her way to Miami until the officers had concluded their inquiry. Under these circumstances, the court finds the on-board encounter not to have been voluntary, but rather to have constituted a detention.

■■■ Not all detentions, however, qualify as arrests that require *Miranda* warnings. *See Florida v. Royer*, 460 U.S. at 498, 103 S.Ct. at 1324; *Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984); *United States v. Foley*, 735 F.2d 45, 47 (2d Cir.1984), *cert. denied*, 469 U.S. 1161, 105 S.Ct. 915, 83 L.Ed.2d 928 (1985). A person may be stopped and briefly detained for investigative questioning without *Miranda* warnings if a law enforcement officer has a reasonable suspicion supported by articulable facts that the person has committed or is about to commit a crime. *See United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Florida v. Royer*, 460 U.S. at 498, 103 S.Ct. at 1324; *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

■■■ While the concept of reasonable suspicion is no more easily reduced to " 'a neat set of legal rules' " than is the concept of probable cause, *see United States v. Sokolow*, 109 S.Ct. at 1585 (quoting *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)), this court has no difficulty in finding its presence in this case. Before Inspector Cordo-va boarded flight 011 to speak to Bareno–Burgos, he had discovered in defendant's luggage, checked through to Colombia, hundreds of thousands of dollars in United States currency concealed in children's toys. In *United States v. Sokolow, supra*, the Supreme Court found suspicious a person's payment of $2,100 in cash for airline tickets. "Most business travelers, we feel confident, purchase airline tickets by credit card or check ... and few vacationers carry with them thousands of dollars in $20 bills." 109 S.Ct. at 1586. This court feels confident in labelling the money transfer in this case even more out of the ordinary than what took place in *Sokolow*. The greenest law enforcement officer in New York—which Inspector Cordova was far from being—knows that Colombia is a source country for cocaine; that cocaine trafficking generates huge quantities of cash; that transfers of the illicit profits of such trafficking are generally done surreptitiously, often through couriers; and that such couriers and the individuals for whom they act rarely comply with currency reporting requirements lest they draw law enforcement attention to the vast unexplained wealth that they have accumulated.[8] The totality of circumstances known to Inspector Cordova before he boarded flight 011 to question Bareno–Burgos reasonably supported his suspicion that defendant was endeavoring to transport half a million dollars of narcotics proceeds out of this country in violation of currency reporting requirements and justified his further investigation of the matter.

To support a stop simply on reasonable suspicion, however, law enforcement officers must ensure that "the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77

---

**8.** If the money was narcotics proceeds, it was immediately forfeitable pursuant to 21 U.S.C. § 881(A)(7), as well as eventually forfeitable pursuant to 31 U.S.C. § 5317(c) if no currency report was filed. Thus, it was appropriate for law enforcement authorities to make some inquiry about the money promptly after discovering it, rather than waiting until Miami. The fact that Inspector Cordova's first questions re-lated to currency filing requirements and the amount of money defendant was carrying, rather than to the source of the money, was hardly an unreasonable approach to the suspicious circumstances confronting him. *See United States v. Sokolow*, 109 S.Ct. at 1587 (courts are poorly equipped to second-guess the investigative techniques used by police).

L.Ed.2d 110 (1983). Thus, unduly long detentions, *see id.* at 709–10, 103 S.Ct. at 2645–46 (ninety minute detention too long to qualify as investigatory stop), or ones that place a suspect in a more restrictive environment than a legitimate inquiry warrants, *see Florida v. Royer,* 460 U.S. at 505, 103 S.Ct. at 1328 (no legitimate law enforcement purpose justified removing suspect to small police room), have been held to constitute *de facto* arrests.

■ Defendant urges this court to find that he was arrested, and not simply stopped, because his questioning in the airplane galley was analogous to the isolated questioning held to be custodial in *Royer.* Indeed, the facts are quite different. Although an airplane galley may be no larger in terms of square feet than the closet-like interview room in *Royer,* Bareno–Burgos was hardly isolated from the public to the same extent Royer was. Royer was in a small enclosed room "alone with two police officers." *Florida v. Royer,* 460 U.S. at 502, 103 S.Ct. at 1327. No one could see or hear anything that transpired. An airline galley is not an enclosed room, but more like a hallway, within a few feet of seated passengers. This case simply did not involve the sort of total isolation more reflective of custody that was at issue in *Royer.*

Moreover, the concern in *Royer* was not so much that the defendant was moved from one location to another, since the Court recognized "reasons of safety and security" that would justify such a move. *Id.* at 504, 103 S.Ct. at 1328. Rather it was the absence of "any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room." *Id.* at 505, 103 S.Ct. at 1328. Thus, this court does not read *Royer* as announcing a per se rule that moving a suspect from one location to another automatically converts the encounter to an arrest. *See* LaFave, *Search and Seizure,* Vol. III § 9.2 at 399 (1990). Indeed, no such rule could be assumed in light of *United States v. Sokolow, supra,* wherein the Supreme Court upheld as a *Terry* stop

a DEA agent "grab[bing]" a defendant by the arm and ultimately escorting him to an office for further inquiry. 109 S.Ct. at 1584; *see also United States v. Bengivenga,* 845 F.2d 593, 599–600 (5th Cir.) (en banc) (moving suspect from bus to trailer for questioning at which bus driver was present does not amount to a formal arrest), *cert. denied,* 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988).

■ This is not to say that the location in which a suspect is questioned is irrelevant to the determination of whether police are engaged in a stop or an arrest, but simply that it is one, among many, factors that must be assessed in light of the particular law enforcement concerns at issue. *See United States v. Pelusio,* 725 F.2d 161, 165 (2d Cir.1983) (court may consider the nature of the crime under investigation, the location of the stop, the time of day, and the reaction of the suspect to the approach of the police in assessing whether a stop has been reasonably conducted); *see also United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985) ("The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it").

In this case it is perfectly understandable why law enforcement authorities questioned defendant somewhat apart from the congested seating area of a full airplane. Their inquiry was going to involve defendant's possible acknowledgement that he was transporting half a million dollars in his checked luggage. Both Bareno–Burgos and the authorities would undoubtedly have preferred such a subject to be discussed with some discretion.

The totality of circumstances, when viewed objectively, satisfy this court that, when questioned on board flight 011, Bareno–Burgos was not subjected to the degree of restraint associated with a formal arrest. The officers were not in uniform, no weapons were displayed, their voices were not raised, no physical force was used, and the secondary location to which he was taken—the galley—was neither so confining, isolated, reflective of police authority

or otherwise comparable to an official detention facility as to be characterized as a custodial environment. Moreover, the questioning took only five minutes, it focused specifically on the concerns of the officers, and, had defendant truthfully acknowledged his possession of over $500,000 and either filled out a currency report or indicated an intent to do so in Miami, would likely have ended in his proceeding on his journey, not in any further detention.

The encounter on board flight 011 having been an investigative stop rather than an arrest, there was no need for defendant to be advised of his *Miranda* rights before questioning. The court declines to suppress the responses he made.

### B. *Statements at Kennedy Airport Office*

■ In an affidavit submitted to this court in support of his motion to suppress, Bareno–Burgos contends that he did not understand the *Miranda* warnings given to him at Kennedy Airport after his arrest. The defendant did not take the stand to explain this contention further at the suppression hearing. This court credits the testimony of Inspector Cordova that he advised the defendant of his rights in Spanish using a standard card and that defendant acknowledged understanding them. The court is satisfied that the rights were accurately and clearly stated. Inspector Cordova's ability to communicate effectively in Spanish is undisputed.

There being no factual basis for the claim that defendant did not understand his rights, the court denies his motion to suppress statements made at Kennedy Airport.

## IV. 18 U.S.C. § 1001

■ Bareno–Burgos' statements to Inspector Cordova denying possession of more than $10,000 in currency or monetary instruments and affirmatively representing that he was carrying only $1,700 in cash were plainly lies. The government charges in Count II of the indictment that these false statements violated 18 U.S.C. § 1001.[9]

Defendant seeks dismissal of Count II, invoking the "exculpatory no" exception to § 1001. *See, e.g., United States v. Cogdell,* 844 F.2d 179, 182 (4th Cir.1988) (and cases cited therein).[10] This judicially-created exception is premised on an assumption that § 1001 was "not intended to reach mere exculpatory denials of guilt." *Id.* Some courts even consider prosecution for false statements, when "a truthful answer would have incriminated the declarant," to come " 'uncomfortably close to [violating] the Fifth Amendment.' " *Id.* at 182–83 (quoting *United States v. Lambert,* 501 F.2d 943, 946, n. 4 (5th Cir.1974) (en banc)).

The viability of the exception is, however, called into question by such cases as *United States v. Rodgers,* 466 U.S. 475, 479, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984), in which the Supreme Court made clear that the prohibitions of § 1001 are "sweeping" and extend to virtually "all matters confided to the authority of [any federal] agency or department." It cautioned that courts were not to question "whether Congress actually intended what the plain language of § 1001 so clearly imports." However meritorious a court's arguments may be for limiting the statute's reach, "[r]esolution of the pros and

---

**9.** 18 U.S.C. § 1001 provides:
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**10.** The courts that recognize the "exculpatory no" exception find it applicable when:

(1) the false statement was not made in pursuit of a claim to a privilege or a claim against the government;
(2) it was made in response to inquiries initiated by a federal agency or department;
(3) it did not pervert the basic functions entrusted by law to the agency;
(4) it was made in the context of an investigation rather than of a routine exercise of administrative responsibility; and
(5) it was made in a situation in which a truthful answer would have incriminated the declarant.
*Id.* at 183.

cons of whether a statute should sweep broadly or narrowly is for Congress." *Id.* 104 S.Ct. at 1948; *see also United States v. Cogdell,* 844 F.2d at 187 (Wilkins, J., concurring in part and dissenting in part) (noting courts' unsuccessful attempts to impose limitations on RICO, "another statute deemed too broadly drafted by Congress").

As defendant himself recognizes, the Second Circuit has been among the least hospitable to the "exculpatory no" exception. *See, e.g., United States v. Capo,* 791 F.2d 1054, 1069 (2d Cir.), *vac. in part, on other grounds,* 817 F.2d 947 (1986) (en banc); *United States v. Grotke,* 702 F.2d 49, 53 (2d Cir.1983). In the latter case, the court expressly found it within the jurisdiction of the Customs Service to inquire as to the amount of currency an international traveler was carrying when crossing this country's borders. A person who lies in response is prosecutable under § 1001.

Although Bareno–Burgos seeks to distinguish *Grotke* on the ground that the passenger was entering rather than departing the United States, there is no question that federal law is as concerned with money leaving this country as it is with money being brought in. 31 U.S.C. § 5316. The court in *Grotke* further noted that the defendant in that case had been warned of his reporting requirements by being given a form 6059. *Cf. United States v. Schnaiderman,* 568 F.2d 1208, 1213 (5th Cir.1978) (applying "exculpatory no" exception where individual not advised of duty to report currency). In this case, Bareno–Burgos was warned both orally, and on form 503, of the requirement that those carrying more than $10,000 out of the United States must file a report.

Defendant, however, draws attention to the fact that the 6059 form given to Grotke plainly advised him that "False Statements Made To A Customs Officer Are Punishable By Law," whereas he received no such warning. The difference is irrelevant. *See generally United States v. Gomez Londono,* 553 F.2d at 811 (agents not required to tell suspect that there is no penalty if he tells the truth regarding currency transportation). Indeed, the Supreme Court has

held that a person charged with violating § 1001 need not even know that his statements were made in a matter within federal agency jurisdiction. *United States v. Yermian,* 468 U.S. 63, 68, 104 S.Ct. 2936, 2939, 82 L.Ed.2d 53 (1984).

Bareno–Burgos cites to the *Grotke* court's finding that "[n]owhere does Form 6059–B, or the actions of the Customs officials suggest that it is illegal to carry in excess of $5,000 across our border." *Id.* at 53. Thus, the defendant in that case could not reasonably have thought that a truthful answer to the questions posed on the form exposed him to any criminal penalties. In an affidavit submitted in support of his motion, Bareno–Burgos claims that the language of form 503 in fact led him to believe that he was already subject to arrest for attempting to transport unreported cash. Form 503, quoted in its entirety, *supra,* does not say that one who attempts to transport cash without reporting it is subject to arrest. It says that one who attempts such a transportation "must file a report." It is the failure to comply with this reporting requirement that can have civil and criminal consequences. This court finds from the evidence adduced at the hearing that the exchange between Bareno–Burgos and Inspector Cordova was aimed solely at providing him with an opportunity to fill out a currency report if he wished to do so and was in no way intended to convey that he was already subject to arrest and prosecution. As in *Grotke,* defendant "could not have suffered any penalty or sanction at the hands of the Customs officials had he truthfully reported the currency in his possession," and could not, from the language of the form, have reasonably thought otherwise. *Id.* at 54 (quoting *United States v. Fitzgibbon,* 619 F.2d 874, 881 (10th Cir.1980)).

In any event, Bareno–Burgos did not simply deny having more than $10,000 in his possession. He affirmatively represented that he was carrying only $1,700. He argues that he did not volunteer this information; rather he was "compelled" to give this response by Inspector Cordova's "specific questioning." However he came to make this statement, it is not simply an

"exculpatory no." In *United States v. Capo, supra,* the Second Circuit made plain that, if it were ever to adopt the "exculpatory no" exception, it "would construe it narrowly, ruling that any statement beyond a simple 'no' does not fall within the exception." 791 F.2d at 1069.

█ Finally, Bareno–Burgos argues that, since he was under no duty to report the currency in New York, he cannot be prosecuted under § 1001, in light of the First Circuit's decision in *United States v. Anzalone,* 766 F.2d 676 (1st Cir.1985). But as the court in *Anzalone* noted, § 1001 "encompasses two distinct offenses: concealment of a material fact, and false representation of a material fact." *Id.* at 682. Anzalone was charged with concealment, a crime that requires proof that a defendant "had a *legal duty* to disclose the material facts at the time he was alleged to have concealed them." *Id.* at 683 (emphasis in original). Bareno–Burgos is charged with making false statements, a crime regardless of any underlying legal duty of disclosure. As the Supreme Court pointedly noted in upholding a § 1001 conviction in *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969):

> [I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood.

The motion to dismiss Count II is denied.

### Conclusion

Because Bareno–Burgos' duty to report an intended international currency transportation had not yet arisen when he was arrested in New York, Count I of the indictment is dismissed. The court rejects defendant's invocation of the "exculpatory no" exception to 18 U.S.C. § 1001 and denies his motion to dismiss Count II. The search of defendant's bags, checked through to Colombia, occurred at the functional equivalent of the border. The motion to suppress currency found therein is denied. Statements made by the defendant on board flight 011 were pursuant to an investigatory stop. The motion to suppress them for failure to give *Miranda* warnings is denied. The motion to suppress statements made after advice of rights, on the ground that defendant failed to understand his rights, is unsupported by the evidence and, therefore, denied.

SO ORDERED.