**UNITED STATES of America, Plaintiff–Appellee,**

v.

**$500,000 IN UNITED STATES CURRENCY, Defendant,**

**Boris Gordin; Anchor Enterprises, Inc.; Saturn Systems Overseas; Andrey Kornev, Claimants–Appellants.**

**No. 1472, Docket 94–6281.**

United States Court of Appeals, Second Circuit.

Argued June 6, 1995.

Decided July 28, 1995.

Steven D. Ecker, Hartford, CT (James T. Cowdery, Cowdery & Ecker, L.L.C., Hartford, CT, Peter R. Ginsberg, Gold & Wachtel, New York City, of counsel) for claimants-appellants.

Carl J. Schuman, Asst. U.S. Atty., Hartford, CT (Christopher F. Droney, U.S. Atty. for the D. of Conn., New Haven, CT, of counsel) for plaintiff-appellee.

Before: MINER, LEVAL, and CABRANES, Circuit Judges.

MINER, Circuit Judge:

Claimants-appellants Boris Gordin, Anchor Enterprises, Inc., Saturn Systems Overseas, and Andrey Kornev appeal from a judgment entered in the United States District Court for the District of Connecticut (Dorsey, Chief Judge) after the district court granted the government's motion for summary judgment. The district court determined that there was probable cause to believe that claimant Boris Gordin had attempted to fail to file an International Transportation of Currency or Monetary Instrument Report when transporting $500,000 out of the United States. *See Unit-ed States v. $500,000 in U.S. Currency*, 858 F.Supp. 13 (D.Conn.1994). Accordingly, the court determined that forfeiture of the $500,000 was proper under 31 U.S.C. § 5317(c) and ordered that the funds be forfeited to the United States. We reverse.

## BACKGROUND

The relevant facts are not in dispute. Claimant Boris Gordin, a Latvian citizen, is president of a Connecticut corporation known as Anchor Enterprises, Inc. In April of 1992, Gordin opened a bank account at the Fleet Bank in West Hartford, Connecticut. In late November of that year, a Fleet Bank employee contacted a special agent of the Federal Bureau of Investigation ("FBI") to provide information regarding Gordin and his Fleet account. The employee informed the agent that Gordin had stated to bank employees that he was in the import-export business, and that he had a partner in Denmark who would be wiring $1,000,000 to his account from overseas. According to the bank employee, Gordin also had indicated that he wanted to withdraw the $1,000,000 in cash. After receiving this information, the agent eventually determined that Gordin did withdraw $1,000,000 in cash after receiving a wire transfer in that amount.

On May 5 and 6, 1993, agents of the FBI received further information from officers of the West Hartford Police Department and from representatives of Fleet Bank concerning Gordin's banking activities. Specifically, Fleet personnel informed the West Hartford police that Gordin repeatedly had received large overseas wire transfers and then had withdrawn the full amounts of the transfers in cash. Federal law enforcement officials later learned that Gordin had, after receiving wire transfers, withdrawn $515,000, $1,060,000 and $1,300,000 on March 23, April 7, and May 5, 1993, respectively.

On May 11, 1993, West Hartford police telephoned the FBI and informed them that Gordin had received an overseas wire transfer into his account in the amount of $500,000. On that day, the local police and the FBI began surveillance of the Fleet Bank in West Hartford. A short time after the sur-

veillance began, Gordin was observed entering the bank. After remaining in the bank for a short period, Gordin left the bank carrying a bag. He then was followed to Bradley International Airport in Windsor Locks, Connecticut. At the airport, Gordin was stopped by airport officials, who searched the two bags that he was carrying. In one of the bags, the officials found $500,000 in $100 bills.

Gordin was detained and questioned by detectives of the Connecticut State Police. He explained to the detectives that he was transporting the cash in connection with his business, Anchor Enterprises, Inc. He stated that he had withdrawn over $3,000,000 in cash from March to May of 1993 and had flown the cash back to Latvia. He explained that, by executing the transactions in this manner, he was able to avoid the 1% exchange fee charged by European banks. Gordin also told the officers that he had withdrawn $500,000 in cash from the Fleet account that day and that he was transporting the cash to Latvia. He explained that he had planned to take the TWA flight from Bradley to Kennedy Airport in New York. From there, he had planned to fly to Helsinki, Finland and then travel to Latvia. Gordin also told the officers that, on his previous trips, he had cleared customs by showing United States Customs officials letters from Fleet Bank indicating that the bank had completed Currency Transaction Reports ("CTRs") as required by federal law.

The FBI seized the $500,000 that Gordin had been carrying, and invited him to come in for an interview on the next day. On the next day, Gordin appeared with his attorney, Bruce Temkin, at the Hartford office of the FBI. Representatives of the FBI, the United States Attorney's Office and the United States Customs Service were present at the interview. Temkin confirmed the information that Gordin had provided the day before. He also stated that he had advised Gordin to obey federal law regarding the transportation of cash outside the United States. Temkin further stated that he and Gordin were aware of what the United States laws required and that they both believed that Gordin had complied with the laws. Specifically,

Temkin explained that Gordin complied with United States law when transporting cash by showing Customs officials at Kennedy Airport letters from Fleet Bank indicating that Fleet personnel had filled out CTRs regarding the particular transactions in question. Neither Gordin nor Temkin, however, indicated that Gordin ever had completed a International Transportation of Currency or Monetary Instrument Report ("ITCMIR" or "CMIR") with respect to the transfers of cash.

Based upon the foregoing, the federal government commenced a civil forfeiture action against the $500,000 found in Gordin's bag. The government's position was that Gordin knowingly had attempted to transport out of the United States a monetary instrument of more than $10,000 for which no CMIR had been filed, in violation of 31 U.S.C. § 5316. Section 5316(a) provides, in pertinent part, that "a person . . . shall file a [CMIR] when the person . . . knowingly . . . transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time . . . from a place in the United States to or through a place outside the United States." Based on that violation, the government contended that the $500,000 was subject to forfeiture under the statute's forfeiture provision, 31 U.S.C. § 5317(c).

In response, the claimants, consisting of Gordin and others involved in his business, moved for summary judgment. They contended that, under section 5316, there was no duty to file a CMIR until Gordin reached the port of departure, in this case, Kennedy Airport. The claimants relied on cases establishing that where the alleged illegal transportation of currency involves a domestic flight that connects with an international flight, the duty to file a CMIR does not arise until the person attempts to board the international flight. *See, e.g., United States v. Bareno–Burgos,* 739 F.Supp. 772, 781–83 (E.D.N.Y.1990). The government then cross-moved for summary judgment. In its motion, the government conceded that section 5316 imposed no duty on Gordin to file a CMIR until he reached Kennedy Airport. Nevertheless, it crafted a new argument, relying upon section 5324(b) of Title 31. Sec-

tion 5324(b) makes it unlawful for a person to fail to file a CMIR for the purpose of evading the reporting requirements. In addition, the government noted, the second sentence of section 5317(c) authorizes forfeiture for "a transaction or attempted transaction in violation of section 5324(b)." Therefore, the government contended that Gordin's conduct was "an attempted failure to file" a CMIR, and was a proper basis for the forfeiture of the $500,000.

The district court accepted the government's novel theory, and determined that there was probable cause to believe that Gordin's conduct constituted an attempted transaction in violation of section 5324(b). The claimants then moved for reconsideration, reiterating that no duty to file a CMIR ever had arisen, and also contending that the district court had drawn unjustifiable inferences from the evidence before it. The district court denied the motion. Claimants appeal.

## DISCUSSION

On appeal, the claimants' central contentions are that 31 U.S.C. §§ 5317(c) and 5324(b), the statutes on which the district court relied in upholding the forfeiture, do not authorize forfeiture based on an attempted failure to file a CMIR, and that § 5324(b)(1) applies only where there is a purpose to evade, which was not shown. We agree.

■ As a preliminary matter, we note that the claimants did not properly raise the first of these arguments in the district court and that, in general, " 'a federal appellate court does not consider an issue not passed upon below.' " *Amalgamated Clothing and Textile Workers Union v. Wal–Mart Stores, Inc.*, 54 F.3d 69, 73 (2d Cir.1995) (quoting *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976)). However, it is well settled that this general rule may be disregarded "when necessary to avoid manifest injustice," *Schmidt v. Polish People's Republic,* 742 F.2d 67, 70 (2d Cir.1984), or where there is "some extraordinary need . . . to consider appellants' claim." *Christensen v. Kiewit–Murdock Inv. Corp.,* 815 F.2d 206, 215 (2d Cir.), *cert. denied,* 484 U.S. 908, 108

S.Ct. 250, 98 L.Ed.2d 209 (1987). Because we believe that the district court's interpretation runs contrary to the only sensible reading of the statutory text, and that allowing the forfeiture to stand in this case would result in a manifest injustice, we address the merits of the claimants' argument.

The issue before us involves the interplay of three sections of the law governing the transportation of monetary instruments out of the United States. Section 5316(a) of Title 31 sets forth conduct that is required by federal law:

> [A] person . . . shall file a [CMIR] when the person . . . knowingly—
>
>> (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—
>>
>>> (A) from a place in the United States to or through a place outside the United States.

Subsection 5324(b)(1) of the same title then sets forth a number of prohibited actions:

> No person shall, for the purpose of evading the reporting requirements of section 5316—
>
>> (1) fail to file a report required by section 5316, or cause or attempt to cause a person to fail to file such a report. . . .

Thus, only three things are prohibited by subsection 5324(b)(1): failing to file a report, causing a person to fail to file a report, and attempting to cause a person to fail to file a report. A third provision of the statutory scheme, section 5317(c), authorizes forfeiture under certain circumstances:

> If a report required under section 5316 with respect to any monetary instrument is not filed . . . the instrument and any interest in property, including a deposit in a financial institution, traceable to such instrument may be seized and forfeited to the United States Government. Any property, real or personal, involved in a transaction or attempted transaction in violation of section 5324(b), or any property traceable to such property, may be seized and forfeited to the United States Government.

■ The position pressed by the government below, and the position adopted by the

district court, was that because section 5324(b)(1) criminalizes the failure to file a CMIR, section 5317(c) authorizes forfeiture for an "attempted" failure to file a CMIR. The reasoning behind this position is simple. First, subsection 5324(b)(1) proscribes the failure to file a CMIR. Next, the second sentence of section 5317(c) authorizes forfeiture of property used in "a transaction or *attempted transaction* in violation of section 5324(b)." (emphasis supplied). Therefore, the argument goes, "attempted failures to file" may result in forfeiture. We disagree with this contention, which we think is inconsistent with the statutory scheme.

First, the government pulls the phrase "attempted transaction" out of context. Section 5317(c) does not simply authorize forfeiture for "a transaction or attempted transaction"; it authorizes forfeiture for "a transaction or attempted transaction in violation of 5324(b)." We believe that Congress intended this phrase to refer to the specific prohibitions listed in section 5324(b). That is, by using the phrase "attempted transaction" in section 5317(c), Congress was referring to those bases for liability described as "attempts" in section 5324(b), such as "attempt[ing] to cause a person to fail to file [a CMIR]." Accordingly, forfeiture is not appropriate under the second sentence of section 5317(c) until an independent violation of 5324(b) can be proven; section 5317(c), by its own force, does not create any additional bases for forfeiture.

 We also note that the interpretation urged by the government would authorize forfeiture for an attempted "attempt to cause a person to fail to file a [CMIR]." Such a result is absurd, and for that reason an interpretation leading to it should be rejected. *See Pharmaceutical Soc'y of New York v. New York State Dep't of Social Servs.*, 50 F.3d 1168, 1172 (2d Cir.1995). Accordingly, we conclude that the district court's determination was in error. Furthermore, the government, which first invoked § 5324(b) only after the claimants had moved for summary judgment, failed to recognize that a violation of § 5324(b) requires proof of a "purpose of evading the reporting requirements of section 5316"; the government's Local Rule

9(c)(1) statement of material facts fails to assert such a purpose; claimants submitted convincing proof of absence of purpose to evade; and Judge Dorsey, in granting summary judgment of forfeiture, made no finding as to purpose to evade.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed.